**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

JANE DOE, an individual filing
anonymously under a pseudonym,

Plaintiff,

Case No.
Hon.

v.

CARHARTT, INC., a Michigan corporation,
MARK VALADE, in his individual capacity,
LINDA HUBBARD, in her individual capacity,
TODD CORLEY, in his individual capacity,
AMY FENCYK, in her individual capacity,
ANNA INCH, in her individual capacity, and
JENNIFER PISCOPINK, in her individual capacity,
ANDREA DUDEK, in her individual capacity, and
JODI RUFFIN, in her individual capacity,

Defendants.

**DEMAND FOR JURY TRIAL**

_______________________________________________________________/

THOMAS R. WARNICKE (P47148)
LAW OFFICE OF THOMAS R. WARNICKE, PLLC
Attorney for Plaintiff
30200 Telegraph Road, Suite 102
Bingham Farms, MI 48025
(248) 410-3031
tom@warnickelaw.com

---

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, Jane Doe, by and through her counsel, Thomas R. Warnicke of the Law Office of Thomas R. Warnicke, PLLC, and for her Complaint against Defendants Carhartt, Inc., Mark Valade, Linda Hubbard, Todd Corley, Amy Fencyk, Anna Inch, Jennifer Piscopink, Andrea Dudek and Jodi Ruffin, states as follows:

## NATURE OF THE ACTION

1. This is a high-stakes civil rights action brought by Plaintiff, Jane Doe, a former high-level corporate Vice President and highest ranking Black executive at Carhartt, Inc., a multi-billion dollar apparel corporation, who was subjected to egregious race discrimination, a hostile work environment, intentional retaliation and termination for speaking out against the horrific racism that was being inflicted upon her and other Black co-workers and for supporting them when they voiced their complaints.

2. Plaintiff seeks at least $100 Million in uncapped compensatory and punitive damages under federal law, 42 U.S.C. § 1981, wherein courts and model jury instructions in civil rights cases under § 1981 establish that the purpose of punitive damages is to punish the

individual or corporate defendant for egregious or malicious conduct, and to deter the defendant and others similarly situated from engaging in similar unlawful discrimination in the future. *State Farm Mut. Automobile Ins. Co. v. Campbell*, 538 U.S. 408 (2003) (reaffirming *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996)).

3. Evidence of a Defendant's financial status and net worth is considered relevant and admissible in assessing an appropriate punitive damage award, ensuring the penalty is severe enough to sting and achieve deterrence without being disproportionate or ruinous. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981).

4. Defendant Carhartt, Inc. is a privately held, family-owned company, thus, it does not have a public stock price or a definitive public market capitalization.

5. However, based on industry metrics, private equity evaluations, and recent revenue reports, private equity and industry analyst estimates suggest Carhartt's enterprise value is between $3.0 Billion and $4.5 Billion.

6. Discussions surrounding private equity interest have noted that the brand's extensive intellectual property, premium pricing power, and crossover lifestyle appeal account for a substantial portion of this total valuation.

7. Carhartt, Inc.'s financial data lists its most recent annual revenues for the past few years at approximately $1.8 Billion to $2.0 Billion a year.

8. Carhartt, Inc. remains entirely owned by the descendants of its founder, Hamilton Carhartt, who established the brand in Detroit in 1889.

9. Plaintiff also seeks millions of additional dollars for economic and emotional distress damages under the Michigan Elliott-Larsen Civil Rights Act (ELCRA), MCL 37.2101 et seq., and the other claims set forth herein.

## JURISDICTION AND VENUE

10. This Court has subject-matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 (federal question) and 28

U.S.C. § 1343 (civil rights), and there also exists complete diversity of jurisdiction between the Plaintiff and all Defendants under 28 U.S.C. § 1332, as Plaintiff is a resident and citizen of the state of Pennsylvania, while Defendant Carhartt, Inc. is incorporated and has its principal place of business in the state of Michigan, and that all individual Defendants are residents and citizens of the state of Michigan (or a state other than Pennsylvania), and the amount if controversy exceeds $75,000, excluding interest and court costs.

11. This Court also has pendent/supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367, as they arise from the same nucleus of operative facts.

12. Venue is proper in the Eastern District of Michigan under 28 U.S.C. § 1391(b) because Defendant Carhartt, Inc. is headquartered in Dearborn, Michigan, Plaintiff and each of the individual Defendants were current or former employees of Defendant Carhartt, Inc., upon information and belief each of the individual Defendants reside within this judicial district, and the unlawful employment practices, discrimination, and retaliatory acts perpetrated against Plaintiff by Defendants occurred within this judicial district.

## THE PARTIES

13. Plaintiff, Jane Doe, is a Black female residing in the State of Pennsylvania. At all relevant times, she was a highly accomplished, exemplary corporate employee of Defendant Carhartt, Inc. in the position of Vice President, Global Talent Management, earning a significant annual base salary, plus executive bonuses, perks, insurance benefits and other incentives, which collectively exceeded $600,000 in 2025. (A genuine copy of Plaintiff's Employment Agreement with Carhartt is attached hereto as **Exhibit 1**).

14. Defendant, CARHARTT, INC. (hereinafter referred to as Carhartt), is a privately held, family-owned, multi-billion-dollar global apparel corporation, incorporated in the state of Michigan, with its principal place of business and corporate headquarters located in Dearborn, county of Wayne, state of Michigan. Defendant Carhartt conducts extensive business internationally, throughout the United States and in the State of Michigan, maintaining a brand image tied heavily to urban lifestyle and streetwear culture.

15. Defendant MARK VALADE (hereinafter referred to as Valade), was at all relevant times, the Executive Chairman, Chairman of the Board, and/or Chief Executive Officer (CEO) of Carhartt, Inc., whose family owns Carhartt, Inc., and who personally possessed ultimate operational authority, and who held ultimate responsibility for executive appointments, organizational direction, leadership accountability, and company culture, actively participated in, and/or tacitly approved the discriminatory and retaliatory actions against Plaintiff and other Black employees as detailed herein, as well as contributing and allowing a racially hostile environment to permeate working conditions at Carhartt, which was particularly egregious toward Black employees. Defendant Valade, who is white, runs and owns Carhartt, is being sued in his individual capacity, and has a net worth of over a billion dollars, which is relevant in determining the amount of punitive damages to be awarded to Plaintiff from Defendant Valade personally.

16. Defendant LINDA HUBBARD (hereinafter referred to as Hubbard), was at all relevant times, the President and/or Chief Executive Officer (CEO) and/or top executive operational leader of Carhartt, who held ultimate responsibility for executive appointments, organizational

direction, leadership accountability, and company culture, actively participated in, and/or tacitly approved the discriminatory and retaliatory actions detailed herein that were perpetrated against Plaintiff and other Black employees, as well as contributing to and allowing a racially hostile environment to permeate working conditions at Carhartt, which was particularly egregious toward Black employees. Defendant Hubbard, who is white, is being sued in her individual capacity, and has a net worth in the millions of dollars, which is relevant in determining the amount of punitive damages awarded to Plaintiff from Defendant Hubbard.

17. Defendant TODD CORLEY (hereinafter referred to as Corley), was at all relevant times, the Chief Diversity Officer (CDO) and subsequently the Chief People Officer (CPO) of Carhartt, Inc., who was the direct supervisor of Plaintiff, and who held direct authority over systems responsible for addressing workplace culture, equity, and employee complaints, actively participated in, and/or tacitly approved the discriminatory and retaliatory actions detailed herein, as well as acting in an intentional, deliberate, calculated and unlawful manner that subjected Plaintiff to an ongoing pattern of severe and pervasive sexual

harassment. Defendant Corley, who is Black, is being sued in his individual capacity and has a significant net worth, which is relevant in determining the amount of punitive damages awarded to Plaintiff from Defendant Corley.

18. Defendant AMY FENCYK (hereinafter referred to as Fencyk), was at all relevant times, an HR and Diversity Leader who was promoted by corporate leadership into an expanded Vice President role within Human Resources, actively participated in, and/or tacitly approved the discriminatory and retaliatory actions against Plaintiff and other Black employees as detailed herein, as well as contributing to and allowing a racially hostile environment to permeate working conditions at Carhartt, which was particularly egregious toward Black employees. Defendant Fencyk, who is white, is being sued in her individual capacity and has a significant net worth, which is relevant in determining the amount of punitive damages awarded to Plaintiff from Defendant Fencyk.

19. Defendant ANNA INCH (hereinafter referred to as Inch), was at all relevant times, the General Counsel at Carhartt, who had responsibility for ensuring Carhartt's compliance with workplace laws, rules and regulations, as well as having involvement over Carhartt's

systems responsible for addressing workplace culture, equity, and employee complaints, actively participated in, and/or tacitly approved the unlawful, discriminatory and retaliatory actions against Plaintiff and other Black employees as detailed herein, as well as contributing and allowing a racially hostile environment to permeate working conditions at Carhartt, which was particularly egregious toward Black employees. Defendant Inch, who is white, is being sued in her individual capacity and has a significant net worth, which is relevant in determining the amount of punitive damages awarded to Plaintiff from Defendant Inch.

20. Defendant JENNIFER PISCOPINK (hereinafter referred to as Piscopink), was at all relevant times, a former Senior Vice President of Human Resources at Carhartt, who had responsibility for ensuring Carhartt's compliance with workplace laws, rules and regulations, as well as having involvement over Carhartt's systems responsible for addressing workplace culture, equity, and employee complaints, actively participated in, and/or tacitly approved the unlawful, discriminatory and retaliatory actions against Plaintiff and other Black employees as detailed herein, as well as contributing and allowing a racially hostile environment to permeate working conditions at Carhartt, which was

particularly egregious toward Black employees. Defendant Piscopink, who is white, is being sued in her individual capacity and has a significant net worth, which is relevant in determining the amount of punitive damages awarded to Plaintiff from Defendant Piscopink.

21. Defendant, JODI RUFFINI (hereinafter referred to as "Ruffini"), was at all relevant times, a Senior Director of Compensation and Benefits at Carhartt, with responsibility for and authority over Carhartt's job-leveling processes, including the review, determination, and approval of employee job levels, positions, and corresponding organizational classifications. In this capacity, Defendant Ruffini had direct involvement in and/or approval authority over decisions affecting Plaintiff's position, level, responsibilities, and professional advancement. Defendant Ruffini actively participated in, approved, facilitated, and/or tacitly endorsed the unlawful discriminatory and retaliatory actions against Plaintiff and other Black employees, as detailed herein. Defendant Ruffini also participated in and/or enabled disparate employment practices that disadvantaged Black employees while benefiting from her own promotional and career advancement opportunities within Carhartt. Upon information and belief, Defendant

Ruffini's cooperation with and participation in these practices helped sustain the racially discriminatory systems and practices through which such advancement occurred. Defendant Ruffini, who is white, is being sued in her individual capacity and has a significant net worth, which is relevant to the determination of punitive damages awarded to Plaintiff from Defendant Ruffini.

22. Defendant ANDREA DUDEK (hereinafter referred to as "Dudek"), was at all relevant times, a Senior Director HR Operations at Carhartt, with responsibility for and authority over Carhartt's promotion submission and approval processes, including the review, submission, consideration, and approval of employee promotions and advancement opportunities. In this capacity, Defendant Dudek had direct involvement in and/or approval authority over decisions affecting employee promotions, leadership advancement, and career opportunities, including decisions affecting Plaintiff. Defendant Dudek actively participated in, approved, facilitated, and/or tacitly endorsed the unlawful discriminatory and retaliatory actions against Plaintiff and other Black employees, as detailed herein. Defendant Dudek also participated in and/or enabled disparate employment practices that

disadvantaged Black employees while benefiting from her own promotional and career advancement opportunities within Carhartt. Upon information and belief, Defendant Dudek's cooperation with and participation in these practices helped sustain the discriminatory systems and practices through which such advancement occurred. Defendant Dudek, who is white, is being sued in her individual capacity and has a significant net worth, which is relevant to the determination of the amount of punitive damages awarded to Plaintiff from Defendant Dudek.

## GENERAL ALLEGATIONS

### Longstanding Organizational Knowledge and Pattern of Racial Discrimination, Failure of Accountability, and Unresolved Concerns Despite Changes In Leadership

23. Defendant Carhartt, as well as the named individual Defendants, have engaged in a pattern and practice of organizational failure to address longstanding issues affecting Black women and diverse employees at Carhartt.

24. Rather than addressing the underlying issues affecting Black women and diverse employees, Defendants allowed a pattern and practice of hostility, retaliation, and barriers to advancement to persist.

25. The undisputable facts set forth herein demonstrate that key leaders across Carhartt's Human Resources, Diversity, Legal, and Executive Leadership, including the named individual Defendants, had knowledge of concerns involving workplace culture, discrimination due to race, leadership behavior, unlawful employee treatment, and the experiences of Black employees.

26. The individually named Defendants held positions of authority and responsibility at Carhartt to identify, address, remedy and correct such issues.

27. Instead of implementing meaningful corrective action, Defendants' decisions prioritized maintaining existing leadership structures, relationships, and organizational interests, which discriminated against Carhartt's Black employees.

28. The result was that Black employees who raised concerns and advocated for change were retaliated against and experienced adverse

employment actions, while the underlying cultural issues, racial discrimination and hostile environment for Black employees remained unresolved.

29. Plaintiff and other Black employees became negatively impacted by an environment where issues and concerns of discrimination due to race, hostile environment due to race, and disparate treatment due to race were known throughout Carhartt, but meaningful accountability and corrective action did not occur.

30. These racial issues and concerns were raised individually to Defendants, HR, Executive Leadership and through Employee Resources Group forums, well before the Plaintiff was hired at Carhartt.

31. By way of example and certainly not limitation, Defendant Piscopink, a white female, served as the senior HR leader at Carhartt that was responsible for the Human Resources organization, employee experience, and the culture within the function.

32. However, during Defendant Piscopink's tenure, concerns arose regarding leadership behavior, treatment of employees,

psychological safety, and the overall HR environment, particularly due to race discrimination perpetrated against Carhartt's Black employees.

33. Defendant Fencyk was hired by Defendant Piscopink and initially worked within Defendant Piscopink's HR organization.

34. However, the relationship between Defendants Fencyk and Piscopink deteriorated significantly, resulting in Defendant Fencyk leaving Defendant Piscopink's organization.

35. While Defendant Fencyk appeared to later acknowledged the severity of the racially hostile environment under Defendant Piscopink's leadership, Dr. Fencyk stated in a very snarky and condescending tone to Plaintiff that she did not understand how Plaintiff was surviving in such a toxic and harassing environment as a Black woman.

36. After experiencing significant conflict with Defendant Piscopink and her organization, Defendant Fencyk moved out of that structure and developed closer relationships with Carhartt's executive leadership (i.e. the Carhartt/Valade family).

37. Defendant Fencyk then became a key participant in bringing Defendant Corley to Carhartt as Chief Diversity Officer, with approval from Defendants Valade and Hubbard.

38. Following Defendant Corley's arrival at Carhartt, Diversity responsibilities were removed from Defendant Piscopink's former organization.

39. Defendant Fencyk assumed a leadership role over Diversity alongside Defendant Corley, increasing her influence over Carhartt's diversity strategy and culture initiatives.

40. At the time Defendants Fencyk and Corley assumed greater responsibility for Diversity, Carhartt and its upper management, including Defendants Valade and Hubbard, were already aware of significant concerns affecting Black women and diverse employees.

41. Defendant Fencyk had direct knowledge of these concerns through her own experiences within HR, her role in Diversity and her relationships with employees and leaders.

42. Defendant Corley had visibility, access and accountability through his role as Chief Diversity Officer.

43. Despite Defendants Fencyk's and Corley's increased responsibility and authority over Diversity, the underlying cultural issues involving race and discrimination at Carhartt continued.

**Specific Incidents of Racial Harassment, Disparate Treatment, Repeated Act of Retaliation and Defendants' Failure to Respond to Race-Based Complaints**

44. By way of example and not limitation, incidents and patterns outlined below demonstrate that racial concerns involving culture, leadership behavior, and the treatment of Black women and diverse employees were very well known at Carhartt.

45. Defendants not only failed to meaningfully address those concerns and take appropriate remedial action, but Defendants retaliated against Black employees, including Plaintiff, that made complaints of discrimination and a hostile environment.

46. The timing, escalation, and cumulative impact demonstrate a pattern in which Plaintiff raised concerns regarding workplace culture, leadership accountability, and employee treatment, as well as participating in investigations in which she supported and agreed with

Black employees' complaints of discrimination, and that Plaintiff was thereafter subjected to various adverse actions affecting her role, advancement opportunities, compensation, and employment with Carhartt.

**Aggressive Beatdown and Hostility**

**Toward Plaintiff in HRLT Meeting**

47. The discriminatory treatment and harassment of Plaintiff began at Carhartt as early as on or about June 6, 2023, when during a Human Resources Leadership Team (HRLT) meeting, former Senior Vice President of HR, Defendant Piscopink, engaged in public aggression toward Plaintiff, screaming and slamming her hand down on the table in response to a professional question raised by Plaintiff.

48. Defendant Piscopink engaged in such a hostile manner because she is white and Plaintiff is black, wherein the corporate culture at Carhartt also supported and allowed such harassing behavior by its white employees toward its black employees.

49. White HR peers within Carhartt, specifically Andrea Dudek. and Jodi Ruffini, witnessed this hostile behavior toward Plaintiff but

failed to intervene, and despite the incident being formally reported to Defendant Hubbard and Defendant Corley, Defendants failed to take any corrective or remedial action.

50. Defendants' failure to take any action exhibited tacit approval for such hostile behavior toward black employees at Carhartt.

**Hostile Environment and Exclusion HRLT Dynamics**

51. Plaintiff, being the only Black Female VP and Member of HRLT experienced repeated hostility, resistance and exclusion during HR Leadership Team interactions.

52. On or about March 13, 2024, Plaintiff experienced resistance and exclusion during HR Leadership Team interactions, which was largely based upon Plaintiff's race.

53. The racially discriminatory conduct occurred in front of two Black female employees of Carhartt who were direct reports to Plaintiff, specifically Shayla Crosby and Olacoy Lawyer, and the conduct was reported to HR and Legal as reinforced visibility of racial hostility and discriminatory treatment within the leadership setting.

## Racially Discriminatory Succession Planning and Racially Disparate Impact

54. Defendant Piscopink, Ms. Crosby, Plaintiff, and Defendants Corley, Hubbard and Fencyk were involved in the talent review process at Carhartt.

55. However, diverse talent was not being advanced into succession pipelines, which was obvious to Carhartt's Black employees.

56. Thus, in May of 2024, as part of their core job responsibility, Plaintiff and her direct report, Ms. Crosby, shared the talent data they collected in a document they prepared entitled "DEI Leadership Racial Demographics," which set forth racially disparate impact and job employment concerns within Carhartt, including setting forth "Data Insights" that reflected, among other things, that 85% of Carhartt's leadership was white; that there was a lack of diversity indicating systemic barriers and/or biases that prevent individuals from underrepresented racial/ethnic backgrounds from accessing leadership roles; that lack of representation contributed to perpetual inequities. in talent dashboards and review materials.

57. A genuine copy of the document prepared by Plaintiff and Ms. Crosby entitled "DEI Leadership Racial Demographics" is attached hereto as **Exhibit 2**.

58. Defendants became upset with Plaintiff and Ms. Crosby for preparing such a document that illustrated in writing systemic racial bias and discrimination at Carhartt.

59. On or about June 26, 2024, Defendant Piscopink, Ms. Crosby and Defendants Corley, Hubbard, and Fencyk were involved in succession planning discussions.

60. Diverse talent within Carhartt, including Plaintiff, were criticized and spoken about in a negative and derogatory manner, without equivalent advocacy or sponsorship from management that was afforded to white employees.

61. Plaintiff's manager, Defendant Piscopink, and two other white female peers, deliberately mischaracterized and undermined Plaintiff's contributions, solely to repress Plaintiff and keep her down.

62. Similar patterns and practice of racial discrimination against Black employees were observed by Plaintiff across other diverse talent within Carhartt.

63. Following the meeting, Ms. Crosby contacted Plaintiff and expressed significant concern and distress over the manner in which Plaintiff's contributions had been mischaracterized and undermined by Carhartt's senior leadership.

64. Defendants Corley and Fencyk failed to intervene or correct the inaccurate representations made against Plaintiff, and the broader implications for the advancement and career opportunities of Black employees at Carhartt.

65. Ms. Crosby conveyed that the treatment of Plaintiff caused her to question whether she, as a Black employee, could have a viable career at Carhartt, and subsequently raised her concerns directly with Defendant Corley, who was then serving as Chief Diversity Officer.

66. Despite being made aware of Ms. Crosby's concerns and their impact, Defendant Corley failed to take action to address the matter.

**Racial Troupe and Referring to**

**Black Woman as a Dog During Meeting**

67. On or about July 8, 2024, a white female VP peer of Plaintiff, Virginia Abramson, made a disparaging comment about Plaintiff during a recorded meeting, stating "Old Dog New Tricks."

68. The comment was reported to Human Resources by Plaintiff's direct reports, Ms. Lawyer and Ms. Crosby, as they felt offended and understood the comment to negatively reference a black woman as a dog.

69. The incident impacted and undermined Plaintiff's credibility and reinforced disrespectful narrative patterns regarding Black women leaders at Carhartt.

**Carhartt Intranet Evoked Horrific Racial Imagery of a Black Woman Dressed as a Slave Picking Cotton**

70. On or about July 15, 2024, there was a horrifically inflammatory and racist image that was shown on an internal Carhartt platform and during an HR meeting, which evoked a Black woman clothed as a slave and sitting in a cotton field.

71. A genuine copy of the image that was shown on an internal Carhartt platform is attached hereto as **Exhibit 3**.

72. The internal image was displayed during a Diversity and Inclusion meeting of Human Resources, which was seen first-hand by Carhartt employees, including a Black female employee of Carhartt.

73. The internal image was racially offensive, derogatory, discriminatory, tremendously hurtful, emotionally devastating, and conjured up images of racist repression, terror and assaults, all of which created a racially hostile work environment at Carhartt for its Black employees.

74. Olacoy Lawyer, a Black female employee, was offended and complained to Human Resources, Plaintiff and other management employees of Carhartt, including certain Defendants, that it was racially offensive, derogatory, discriminatory, tremendously hurtful, emotionally devastating, and conjured up images of slavery, repression, and racist assaults, all of which created a racially hostile work environment at Carhartt.

75. Defendants failed to take any remedial action regarding the intranet image attached hereto as **Exhibit 3**.

76. Not one of the individually named Defendants apologized to any Black employee at Carhartt regarding the image that was shown.

77. Not one of the individually named Defendants apologized to Plaintiff regarding the image that was shown.

78. Not one of the individually named Defendants acknowledged that the image was inappropriate, hurtful, or insensitive in any way.

79. Not one of the individually named Defendants accepted any responsibility for the image that was shown.

80. Defendant Carhartt did not issue a corporate apology to any Black employee at Carhartt regarding the image that was shown.

81. Defendant Carhartt did not apologize to Plaintiff regarding the image that was shown.

82. Defendant Carhartt did not acknowledge that the image was inappropriate, hurtful, or insensitive in any way.

83. Defendant Carhartt did not accept any responsibility for the image that was shown.

84. Defendant Fencyk was the person directly responsible for displaying the image.

85. Defendant Fencyk reported to Defendant Corley at the time it was shown.

86. Defendants did not reprimand Defendant Fencyk in any way for her role in displaying the image.

87. Defendants did not implement any type of diversity or sensitivity training after the image was shown or because of the image being shown.

88. Each of the individual Defendants believed that the complaining Black employees did not have a legitimate basis for being upset and/or feeling that the image was racially offensive or inappropriate in any way.

89. Defendant Carhartt's corporate position was that the complaining Black employees did not have a legitimate basis for being

upset and/or feeling that the image was racially offensive or inappropriate in any way.

90. Each of the individual Defendants believed that the Black employees at Carhartt that were upset by the image were making a big deal out of nothing.

91. Defendant Carhartt's corporate position was that the Black employees at Carhartt that were upset by the image did not have a legitimate basis for being upset or for feeling that the image was racially offensive or inappropriate in any way.

92. The Black employees that complained of racial discrimination and a hostile environment due to the image being shown, including Plaintiff, caused them to be further discriminated and retaliated against by Defendants.

93. It was clear that Defendant Fencyk did not take her role and position with Carhartt seriously, as she presented and distributed the racially offensive image during a department Teams meeting, which included approximately 25 Carhartt employees, evoking a Black woman

dressed as a slave in a cotton field, with the word "Inclusion" prominently superimposed on the image.

94. The image was presented in the context of a discussion about alleged “Inclusion” at Carhartt.

95. The image invoked historical slavery, Black repression and violence toward Blacks.

96. Black female employees of Carhartt that were in the meeting immediately expressed their outrage, objections and concerns to Carhartt Human Resources, upper management and Defendants, as well as to Plaintiff, about the image that was being used, particularly that they felt it was extremely racist and horrifically offensive.

97. Plaintiff promptly reviewed the content of the meeting and was similarly outraged about the horrifically racist imagery that was being presented in the Carhartt workplace.

98. Plaintiff expressed her concerns and complaints about the racist imagery to Carhartt management.

99. Carhartt and the individual Defendants failed to remedy the situation in any way, nor did they issue any type of apology, nor did they address the insulting imagery that was being used within the workplace.

100. Concerns and issues within Carhartt involving leadership behavior, inclusion, employee experience, and barriers affecting Black employees, were routinely ignored and not meaningfully addressed or resolved.

101. These concerns and issues in HR were well known within Carhartt and publicly.

102. Despite Defendants' awareness of leadership and culture issues due to race discrimination and harassment toward Black employees at Carhartt, meaningful corrective action did not occur during Defendant Piscopink's tenure.

**Leadership Team makes Racially Derogatory Reference of a Black Woman Employee Having Disrespectful Body Language**

103. On or about September 25-26, 2024, Plaintiff observed further acts of racial discrimination and the exacerbation of a hostile environment at Carhartt.

104. Specifically, Plaintiff was present at an in-person meeting at Carhartt's headquarters, which was also attended by the Carhartt Senior Leadership Team of Defendants Piscopink, Hubbard and Corley, as well as Ms. Crosby, a Black female on Plaintiff's team.

105. During the meeting, Ms. Crosby was attacked for speaking out regarding her concerns about Carhartt's HR Operations organization being out of ratio according to best practices.

106. Rather than listening to and professionally responding to Ms. Crosby's very legitimate concerns, Carhartt employees with the initials Katrina August and Jennifer Piscopink unfairly labeled the Black female employee as having "disrespectful body language" consistent with angry black women syndrome.

107. Plaintiff never observed Ms. Crosby exhibit disrespectful body language, however, the false and defamatory accusations were made to discredit, undermine and show her that she was not allowed to voice her opinion to white employees or disagree with them.

108. The untrue accusations against Ms. Crosby were framed and published in disparaging manner.

## At HR Manager's Meeting, a Black Woman Was Publicly Reprimanded and Called Disrespectful and Dismissive for Simply Using the Term "Expertise"

109. At a meeting on or about November 1, 2024, multiple managers, including white and Black managers, acknowledged a lack of psychological safety within the Carhartt environment.

110. At the meeting, Ms. Lawyer, a Black female employee, was publicly criticized, berated and reprimanded by Carhartt employee Carrie Herron for simply using the word "expertise."

111. Similar to the false attacks that were made against a Black female employee as set forth above, a different Black female employee on this occasion was characterized as "disrespectful" and "dismissive," reflecting a broader pattern and practice at Carhartt of derogatory labeling of Black women employees.

## Multiple Formal Complaints and The Resulting Investigation

112. On or about November 13, 2024, a formal external investigation led by Tanya Odom was initiated based on the number of

formal race-based complaints made to leadership, which included certain Defendants, regarding workplace concerns.

113. These complaints were formally communicated to Defendants Hubbard, Piscopink, Inch and Corley, as well as to Ms. Odom while she was conducting an external assessment/investigation at Carhartt's request, into the claims of racial disparity, racially hostile environment and other racially discriminatory matters that existed within Carhartt.

114. Ms. Odom was a friend of Defendant Corley's at the time she was retained by Carhartt to conduct her investigation.

115. Ms. Odom's investigation was flawed because of her bias toward Defendant Corley.

116. While the investigation was ongoing, Defendant Piscopink engaged in additional discriminatory and hostile conduct toward Ms. Crosby, which further reflected the pattern of publicly undermining and mischaracterizing the work and contributions of Black employees.

117. During an HR leadership and managers' meeting in January 2025, Defendant Piscopink publicly reprimanded Ms. Crosby and mischaracterized her work, including falsely or inaccurately suggesting

that she was unaware of the progress of her work, its milestones, and related discussions and communications.

118. Defendant Piscopink's characterization did not accurately reflect Ms. Crosby's work and efforts, and the public reprimand left Ms. Crosby visibly and deeply upset, particularly in light of the prior incidents in which Defendant Piscopink had similarly mischaracterized and undermined Plaintiff's contributions before senior leadership.

119. Defendant's Piscopink's conduct during this meeting prompted additional concerns among those present, and multiple employees raised complaints about her behavior with Human Resources.

120. Among those individuals were Lauren Gustella and Liz Nagrant, who had witnessed the meeting and subsequently brought their concerns directly to Defendant Hubbard, reporting Defendant Piscopink's misconduct and expressing that they had witnessed enough of the disparate treatment and believed that action needed to be taken.

121. These additional complaints demonstrated that concerns regarding Defendants' treatment of employees extended beyond Plaintiff

and Ms. Crosby and were independently raised by other employees who had witnessed Defendant Piscopink's misconduct.

122. Upon information and belief, the investigation conducted by Ms. Odom ran from approximately November 2024 through February 2025.

123. Ms. Odom met with Plaintiff during her investigation.

124. Ms. Odom met with Ms. Crosby during her investigation.

125. Ms. Odom met with Ms. Lawyer during her investigation.

126. Ms. Odom met with other employees at Carhartt during her investigation.

127. Despite the overwhelming evidence of racial discrimination, racial disparity and a horrifically hostile racial environment, Plaintiff was told that the "Findings" of Ms. Odom's investigation were characterized as inconclusive.

128. Carhartt did not provide Plaintiff with a copy of Ms. Odom's "Findings."

129. After Plaintiff engaged in protected activity regarding concerns by several members of the Human Resources team related to Defendant Piscopink's behavior and hostile workplace conditions at Carhartt, subsequent organizational changes occurred that were retaliatory toward Black employees at Carhartt.

**Defendants Remove Values Difference (Be Inclusive) As an Accountability and Performance Measure at Carhartt**

130. In January 2025, Defendants Corley and Hubbard made the executive decision to remove the "values differences" from the performance criteria at Carhartt, which negatively impacted the Black employees at Carhartt.

131. This adverse change was intentionally designed to reduce structured accountability for demonstrating inclusion, equity, and leadership behaviors in performance evaluations, to the detriment of the Black employees.

## Defendants' Nefarious Leadership Change and Attempt to Escape Leadership Accountability

132. In or about March of 2025, Carhartt, through Defendant Hubbard, offered a voluntary separation package or a reset with coaching requirements to remaining HRLT team members, specifically, the following: Defendant Piscopink, Diane McCormick, Virginia Abramson, Defendant Dudek Defendant Ruffini and Plaintiff.

133. In March of 2025, Plaintiff was provided with a proposed separation package from Defendant Hubbard.

134. A genuine copy of the proposed separation package that was made by Defendant Hubbard to Plaintiff in March of 2025 is attached hereto as **Exhibit 4**.

135. At the time the separation packages were offered in March of 2025, issues about Defendant Piscopink's performance issues were being directly raised to Defendants, HR Management, and during the investigation.

136. When the separation package was provided to the HRLT team, Defendants Hubbard and Corley specifically approached Plaintiff

and requested that she not accept the package, but they were hoping that certain other team members would.

137. Based upon their request, Plaintiff did not accept the package and remained employed with Carhartt.

138. Of the 6 team members that were offered the separation package, 3 employees accepted it, specifically Defendant Piscopink, Diane McCormick and Virginia Abramson.

139. Defendant Piscopink, despite having performance issues at the time, was allowed to "retire" from Carhartt, was given other perks, and was thrown a retirement party from Carhartt, which was attended by many employees, Defendants Valade, Inch, Hubbard.

140. Plaintiff was required to attend the retirement party for Defendant Piscopink.

141. After Plaintiff did not accept the proposed separation package in March of 2025 through her termination in June of 2026, there were no concerns expressed to Plaintiff by anyone at Carhartt that Plaintiff had any performance issues of any kind.

142. Ultimately, Defendant Piscopink departed Carhartt and the Human Resources structure at Carhartt was redesigned.

143. Following Defendant Piscopink's departure, Defendant Corley assumed responsibility as Chief People Officer at Carhartt, which placed him in authority over the systems responsible for addressing the very issues about which he previously had visibility in his prior position as Chief Diversity Officer.

144. Plaintiff regularly communicated to Defendant Corley her concerns about unlawful treatment in the workplace at Carhartt toward Black employees.

145. Consistent throughout Defendant Corley's tenure, his leadership (or lack thereof) exhibited a disturbing pattern of receiving concerns related to culture, diversity, and the Black employee experience, but failing to implement meaningful corrective action to address or remedy the underlying issues.

146. Despite his role as Chief Diversity Officer and now Chief People Officer, Defendant Corley held responsibility for advancing

inclusion and addressing workplace concerns, but the same issues affecting diverse employees continued and went unaddressed.

147. Defendant Corley's leadership reflected a pattern in which concerns of racial discrimination, including those made by Plaintiff, were voiced, discussed, but not resolved through any accountability, structural change, or intervention.

148. Defendant Corley frequently referenced his close relationship with the Carhartt family, Defendant Valade and the protections provided through his employment agreement, including statements such as, "I have an agreement to do what I want here; I took this job under that context" and "I don't want anyone to think anything nefarious happened as a result of my new role."

149. Those statements contributed to the perception amongst Black employees at Carhartt that viewed his position as insulated from accountability and that his purpose and relationship with executive leadership provided him with significant authority and protection within the organization to adhere to and continue a cultural at Carhartt of white dominance and Black repression.

150. Defendant Corley engaged in a similar pattern of discriminatory conduct and inaction relating to Black and other minority employees at his former employer, Abercrombie & Fitch.

151. Defendants in this case were aware of Defendant Corley's controversial history at Abercrombie and saw it as a feather in his cap and that Corley was the perfect person for them to hire to protect Carhartt's elite white workforce and company, while suppressing the opportunities of Black employees and fostering a racially hostile environment.

152. Defendants, including Defendant Corley, continued a racially discriminatory environment where protected activities were happening at Carhartt in which Plaintiff participated, including complaints of race discrimination and investigations.

153. Plaintiff's engagement in protected activities resulted in continued hostility and retaliation toward her, the withholding of recognition and promotional opportunities, a reduced scope of Plaintiff's work responsibilities, the sabotaging of Plaintiff and her team's work

efforts, and ultimately, the termination of her employment characterized as a position elimination.

154. Defendant Hubbard, as Chief Executive Officer at Carhartt, held ultimate responsibility for executive appointments, organizational direction, leadership accountability, and company culture.

155. Defendant Hubbard also had visibility into Human Resources leadership dynamics, concerns regarding Defendant Piscopink's former leadership, and organizational issues affecting employee experience and diverse employees.

156. Defendant Hubbard approved the appointment of Defendant Corley as Carhartt's Chief Diversity Officer, along with Defendant Valade, despite Defendant Corley's negative prior public leadership history involving his negligence related to discrimination and diversity issues during his tenure at Abercrombie & Fitch.

157. Defendant Hubbard also had visibility into the transition of Diversity responsibilities away from Defendant Piscopink and the increasing influence of Defendants Fencyk and Corley.

158. Under Defendant Hubbard's leadership, significant organizational decisions occurred, including, Defendant Piscopink's departure, Defendant Corley's transition into the Chief People Officer role, and Defendant Fencyk's expanded responsibilities through a two-level promotion.

**Defendants' Unilateral Change of Plaintiff's Job Classification and Refusal to Correct It**

159. Plaintiff was also subjected to an on-going, post-hire shift in her "remote" work classification status.

160. Contrary to the shift, Plaintiff was hired through an executive search firm during the pandemic as a remote employee. (A genuine copy of the documentation provided to Plaintiff that identified the position as "remote" is attached hereto as **Exhibit 5**).

161. When Plaintiff was being recruited, Carhartt was aware that she lived and resided with her family in Pennsylvania.

162. Plaintiff was expressly advised that she might need to travel to Dearborn for meetings at Carhartt's headquarters at most 6-8 times per year.

163. There were no discussions or representations by Defendant Carhartt of any kind that the position may evolve into a non-remote or hybrid-type position.

164. Plaintiff relied on the "remote" position representations because she resided in Pennsylvania and it was not within a reasonable commuting distance from Carhartt's offices in Dearborn, Michigan.

165. Based on Plaintiff's 15+ years of Human Resources experience, she understands role classifications and would not have accepted a role requiring a regular in-office presence beyond approximately once per month.

166. Initially, Plaintiff's working arrangement at Carhartt aligned with this understanding, with in-office expectations approximately 6-8 times per year.

167. After workplace concerns from Plaintiff began to be brought to Carhartt's attention, including those related to race discrimination, Carhartt retaliated against Plaintiff and reframed her employment status as "hybrid," which was contrary to how the position was represented by Carhartt.

168. The reason for the reframed status was Carhartt's way of instituting an adverse employment action against Plaintiff by retaliating against her for making workplace complaints.

169. Additionally, Carhartt expressed its expectations that shifted Plaintiff's role to an increased in-office presence of approximately two times per month, with increasing scrutiny.

170. Plaintiff raised these legitimate concerns with Defendant Corley, both before he became her leader and after he became her leader, but he upheld the corporate decision.

171. After Defendant Corley became Plaintiff's direct leader, Plaintiff's requests for flexibility were more difficult and required case-by-case justification and explanation.

172. Defendant Corley was involved in Plaintiff's hiring process and admitted that he was very aware of her original classification, geographic location and that it was a very burdensome change of terms for Plaintiff.

173. However, despite Defendant Corley's admitted knowledge, the classification was not corrected and increased expectations remained in place.

174. The change created additional pressure, inconsistent expectations, and reduced autonomy regarding the conditions under which Plaintiff accepted the executive role.

175. Moreover, Plaintiff's job duties did not require her to be in the office to the degree that was later being required by Defendants.

176. Defendant Corley's demand that Plaintiff be in the office was due, in part, to his desire to be in the presence of Plaintiff so that he could engage in sexually harassing behavior toward her.

177. Defendants' demand that Plaintiff be present in the office required her to make a well over an hour drive to the airport, fly to Detroit, obtain local transportation, check into a hotel (often in dangerous locations due to budget limitations), then do the same things to get back home.

178. Disturbingly, Carhartt did not require white employees that were hired with a "remote" classification to be in the office with the frequency required of Plaintiff, nor were they forced to endure a reclassification to "hybrid."

179. On many occasions that Plaintiff was told she was "required" to be physically in the Dearborn office, she would often be one of the only employees there and it was obvious that she really did not have to be present.

180. This was disparate and discriminatory treatment toward Plaintiff due to her race, as well as Defendants way of retaliating against her due to her complaints.

**Team Restructure, Organizational Harm, Disparate Treatment, Economic Loss & The "Selective" Promotion Sweep**

181. The above decisions of Carhartt upper management left Defendants Corley and Fencyk feeling untouchable as they both allowed discriminatory ways at Carhartt to prevail.

182. Their behaviors continued and were noticeable in the decisions to restructure the team using external consultant, Lauren

Hornberger, who had prior professional relationships with Defendants Fencyk and Inch from their time working together at Borders Bookstore.

183. Those relationships intersected with discriminatory organizational restructuring efforts at Carhartt.

184. Following Plaintiff's protected activity regarding concerns about Defendant Piscopink's behavior and racially discriminatory actions, the organization and Defendants underwent further retaliatory restructuring against Plaintiff.

185. In July of 2025, Plaintiff's team structure was changed in a detrimental and racially discriminatory/hostile manner.

186. Plaintiff suffered adverse employment actions through this change, which included organizational design and engagement responsibilities that were removed from Plaintiff's scope.

187. Plaintiff's responsibilities were removed and reassigned to expand Defendant Fencyk's scope and to validate her promotion.

188. These decisions constituted adverse employment actions against Plaintiff.

189. Defendant Fencyk ultimately received a two-level promotion into an expanded HR leadership role, alongside the promotions of other white females at Carhartt.

190. Further evidence of Defendants' racial discrimination was that white female leadership peers of Plaintiff received promotions, including Defendants Dudek and Ruffini.

191. In fact, Defendant Fencyk's two-level promotion was from Director to Vice President.

192. Defendant Fencyk's discriminatory promotion was "justified" by Carhartt giving her responsibilities that were stripped from Plaintiff.

193. Plaintiff was not provided with a promotion, despite being qualified and deserving.

194. Further evidence of Defendants' racial discrimination was that white female leadership peers of Plaintiff received promotions, including Defendants Dudek and Ruffini.

195. Despite their knowledge of the racial disparities in Carhartt's promotion and job-leveling practices, and their respective authority over

those processes, Defendants Ruffini and Dudek participated in and/or permitted these inequitable practices to persist while personally benefiting from the same advancement structures through their own promotions and career progression.

196. In addition, their teams received promotions and headcount resources, while Plaintiff did not.

197. The sequence of events resulted in the promotions of white female leaders while the issues affecting Black women (i.e. lack of promotion, retaliation, sabotaging work efforts, etc.) and diverse employees remained unresolved, including adverse actions and retaliation being taken against Plaintiff.

198. Plaintiff was subjected to further racial discrimination and retaliation through Defendants' placement of Carrie Herron on the Plaintiff's team.

199. Plaintiff expressed her objections and concerns about this placement given Carrie Herron's history of making racially insensitive comments toward Black employees.

200. Defendant Corley disregarded the concern, laughed and said "Amy did not approve Carrie's hire from the start of her employment at Carhartt, she should not be a senior manager, so maybe she will leave since she will now be on a leadership team of black women."

201. In fact, another Black female employee, Ms. Lawyer had also raised concerns to HR and Legal and objected to Ms. Herron being placed on the team for the same reasons, and expressed her belief that Plaintiff was being set up for failure and that Defendants placement of Ms. Herron on the team was in retaliation for making prior complaints.

202. Plaintiff's complaints and those of another Black co-worker were not addressed or remediated.

203. Defendant Inch was the General Counsel at Carhartt during the entire time that Plaintiff was employed at Carhartt.

204. Defendant Inch participated in legal matters, organizational decisions, investigations (including those involving complaints made by Black employees of racial discrimination and hostile environment), and restructuring efforts involving Human Resources.

205. Defendant Inch had prior professional relationships with Defendant Fencyk and Lauren Hornberger (a consultant for Carhartt) from their shared employment at Borders Bookstore.

206. These relationships formed part of a professional network of white individuals that worked together to protect Carhartt's discriminatory environment toward its Black employees, as well as allowing a racially hostile environment to permeate the workplace.

207. Through her legal role, Defendant Inch was personally involved in decisions concerning employee matters, organizational risk, investigations, and restructuring.

208. Defendant Inch's involvement included complaints of discrimination made by Plaintiff, as well as investigations involving racial discrimination that also included Plaintiff.

209. Defendant Inch routinely supported Carhartt's legal processes and the organization that cultivated a racially discriminatory environment and toxic and hostile workplace culture, wherein complaints raised by Black employees were routinely dismissed without

any action being taken, and that Black employees, including Plaintiff, were retaliated against when they complained.

**Racially Discriminatory Performance Rating Disparity**

210. During the 2025 performance cycle, Plaintiff and Ms. Lawyer received "Highly Effective" ratings, which were sent and reviewed by Defendant Corley for his approval.

211. Defendant Corley challenged and reduced both ratings to "Effective."

212. The reduction in the performance ratings was due to Plaintiff and the Black employee's previous complaints of race discrimination and hostile environment, as well as Plaintiff's objections to Defendant Corley's sexually hostile comments and actions toward her.

213. However, Defendant Corley approved the employees on Ms. Herron's team of "Highly Effective" ratings.

214. Incredibly, those employees did not have required goals documented in the system, which was a baseline requirement for performance evaluation.

215. White-led team members retained higher ratings at Carhartt, despite inconsistent documentation standards.

216. The rating changes affected perceived performance standing, compensation, and advancement trajectory, which was discriminatory toward Black employees.

217. Concerns regarding inconsistent evaluation standards and retaliation were raised with Defendant Corley, but no corrective or remedial action was ever taken.

**Talent Strategy, Retaliation, & Targeted Denial of Promotions for Black Employees**

218. As part of the request to accelerate the Talent Strategy, the Plaintiff then began to work on the Talent Strategy and promotion requests for her and her team.

219. Collaborative design sessions for this work took place which included Defendant Corley, Plaintiff and her direct reports (Ms. Crosby, Ms. Herron and Ms. Lawyer).

220. Plaintiff requested promotions for Black employees on her team, specifically Shayla and Olacoy, and deferred on Ms. Herron.

221. During this time, Plaintiff advocated for appropriate promotion consideration for Black employees on her team, including Ms. Lawyer and Ms. Crosby, based on their respective contributions and responsibilities.

222. Separately, Plaintiff requested that Ms. Herron's existing role, responsibilities, and job level be evaluated, including whether an adjustment in responsibilities or position classification was warranted.

223. Plaintiff had not previously managed Ms. Herron and therefore had no independent basis to assess her performance or capabilities at the Senior Manager level.

224. Rather, Plaintiff sought an objective evaluation of Ms. Herron's role and responsibilities, just as she had sought appropriate consideration of the roles and advancement opportunities of other members of her team, despite the perceptions Defendant Corley expressed to Plaintiff.

225. Defendant Corley completely delayed and failed to address, honor, respect, or provide his final approval for Plaintiff's recommendations for promotions, which was due to Plaintiff and her team members' race and in retaliation for their making previous complaints.

226. The end result was that Ms. Crosby and Ms. Lawyer were not given promotions, despite the fact that Plaintiff made a recommendation for them to be promoted.

227. Plaintiff also did not get a promotion.

**Racially Hostile and Retaliatory Display of a Cotton Field in the Carhartt Headquarters' Lobby**

228. In or about February 2026, another racial image evoking slavery was presented at Carhartt, this time a cotton field, which was displayed in the Carhartt headquarters' lobby as part of an alleged sustainable cotton display.

229. Carhartt employees entering the headquarters and going to their workstations would have to pass right by the racially insensitive and horrifically hurtful cotton field display.

230. Black Carhartt employees, including Plaintiff, expressed their concerns and voiced objections to Carhartt management about the cotton field display, particularly that they found it to be racially insensitive, derogatory, hurtful and offensive.

231. Plaintiff clearly and unequivocally voiced her concerns and objections to Defendants.

232. Carhartt and the individual Defendants were upset that the Black employees, including Plaintiff, were voicing their complaints about the cotton field display.

233. Defendants believed that Plaintiff's complaints were excessively dramatic, magnified and overblown.

234. Defendants believed that Plaintiff's complaints were not worthwhile or legitimate.

235. In the same manner in which Defendants failed to address or attempt to remedy the earlier horrific racist imagery evoking a Black women sitting in a cotton field, Defendants essentially doubled-down to further put the Black employees in their place by installing an

outrageously offensive cotton field display in the corporate headquarters building at Carhartt.

236. A genuine copy of the cotton field displayed in the lobby of Carhartt's headquarters is attached hereto as **Exhibit 6**.

237. Again, various Black employees at Carhartt felt outrage, pain and indignation, as the cotton field displayed in the lobby of Carhartt's headquarters evoked horrific imagery of racial discrimination, suppression and historical violence toward Blacks.

238. Black employees of Carhartt communicated their objections and complaints regarding the cotton field display in Carhartt's lobby to Defendants and voiced their position that the display should be taken down and removed immediately.

239. Specifically, Ms. Lawyer, a Black female employee of Carhartt, asked during a recorded call with Defendant Fencyk who was responsible for the cotton field display, and Defendant Fencyk replied that her Carhartt team was responsible for it.

240. Consistent with Defendants' complete inaction regarding the issue and complaints of the imagery of a Black female dressed in slavery

garb in a cotton field, Defendants failed to take any remedial action and allowed the cotton field display to remain indefinitely.

241. The cotton field was displayed in the Carhartt lobby for a duration of longer than six months.

242. Black employees of Carhartt were justified in their feelings that the cotton field display was hugely offensive, threatening and demeaning to Black employees at Carhartt and created a hostile and intimidating environment.

243. Not one of the individually named Defendants apologized to any Black employee at Carhartt regarding the cotton field display in the corporate lobby.

244. Not one of the individually named Defendants apologized to Plaintiff regarding the cotton field display in the corporate lobby..

245. Not one of the individually named Defendants acknowledged that the cotton field display in the corporate lobby was inappropriate, hurtful, or insensitive in any way.

246. Not one of the individually named Defendants accepted any responsibility for the cotton field display in the corporate lobby.

247. Defendant Carhartt did not issue a corporate apology to any Black employee at Carhartt regarding the cotton field display in the corporate lobby.

248. Defendant Carhartt did not apologize to Plaintiff regarding the cotton field display in the corporate lobby.

249. Defendant Carhartt did not acknowledge that the cotton field display in the corporate lobby was inappropriate, hurtful, or insensitive in any way.

250. Defendant Carhartt did not accept any responsibility for the cotton field display in the corporate lobby.

251. Defendants did not reprimand anyone for their role in having the cotton field display in the corporate lobby.

252. Defendants did not implement any type of diversity or sensitivity training after the cotton field was displayed in the corporate lobby.

253. Each of the individual Defendants believed that the complaining Black employees did not have a legitimate basis for being upset and/or feeling that the cotton field display in the corporate lobby was racially offensive or inappropriate in any way.

254. Defendant Carhartt's corporate position was that the complaining Black employees did not have a legitimate basis for being upset and/or feeling that the cotton field display in the corporate lobby was racially offensive or inappropriate in any way.

255. Each of the individual Defendants believed that the Black employees at Carhartt that were upset by the cotton field display in the corporate lobby were making a big deal out of nothing.

256. Defendant Carhartt's corporate position was that the Black employees at Carhartt that were upset by the cotton field display in the corporate lobby did not have a legitimate basis for being upset or for feeling that the display was racially offensive or inappropriate in any way.

257. The Black employees that complained of racial discrimination and a hostile environment due to the cotton field display in the corporate

lobby, including Plaintiff, caused them to be further discriminated and retaliated against by Defendants.

258. It was clear that Defendant Fencyk was so emboldened by her previous act of placing the intranet image evoking the Black female in a cotton field, for which she received no remedial action of any kind, that she felt corporate support in doubling-down by displaying a cotton field in the corporate lobby.

259. The cotton field display in Carhartt's corporate lobby evoked images of historical slavery, Black repression and violence toward Blacks.

**Racist "Are You Good at Tap Dancing" Trope**

260. On or about February 26, 2026, Carhartt employee Ms. Herron, a white woman, during a recorded team call, made an intentional and explicitly racist, insensitive and derogatory comment stating directly to a Black employee: "Shayla, are you good at tap dancing in case they get bored." (See attached **Exhibit 7**).

261. Plaintiff was not on the team call when this comment was made.

262. Requesting a Black female co-worker to tap dance for entertainment is a deeply offensive racial trope and constitutes a very insensitive and insulting aggression toward Black people.

263. Such a request is rooted in painful historical caricatures and carries significant legal weight in the modern workplace.

264. The phrase and action of asking a Black person to "tap dance" carries heavy racial baggage rooted in slavery and the minstrel show era.

265. In the 19th and early 20th centuries, minstrel shows featured performers (often white actors in blackface) who portrayed Black people as caricature figures existing solely to perform, clown, and beg for white approval, which serve to mock, embarrass and humiliate Black people.

266. Enslaved people and early Black entertainers were frequently forced to perform on command for the amusement of white audiences.

267. There can be no legitimate dispute that in modern times, the phrase "tap dancing for the white man" remains a known idiom used to describe a Black person humiliating themselves, putting on a

performance, or compromising their dignity to please or placate a dominant group.

268, In a professional setting, asking a Black colleague to dance for entertainment clearly evidences racial hostility and discriminatory harassment in the workplace.

269. Making such a request reduces a professional peer to an exoticized or historical caricature meant to humiliate them into performing on command.

270. Ms. Crosby, the Black female employee that was the target of the comment, promptly reported and complained about the comment to Plaintiff, as well as to Carhartt management, its legal department and investigators.

271. The target of the insult was justified in feeling upset, angry, sad and hurt because of the question that was posed to her.

272. Plaintiff reviewed the recording of the comment, followed up with team members who attended the call, and confirmed that they had significant concerns regarding the racially insensitive and derogatory nature of the comment.

273. A non-Black co-worker who attended the call, Ricardo Porras, stated that he was very offended by the comment, which he believed was racially insensitive toward Blacks, completely inappropriate and highly offensive.

274. Plaintiff was also personally offended when she heard the racially derogatory comment that was made and felt absolute disgust in knowing that Carhartt's workplace and environment not only allowed for such a horrible comment to be made but condoned it.

275. Plaintiff immediately reported the incident to Defendant Corley and provided both the recording and transcript through Teams.

276. Defendant Corley directed Plaintiff to speak with the employee that made the statement, Ms. Herron, to document the incident as part of Ms. Herron's mid-year review, and to seek guidance from Dionardo, an external DEI consultant that was engaged by Carhartt.

277. Plaintiff did discuss the matter with Ms. Herron and brought the matter to Dionardo's attention for review.

278. Dionardo reviewed the matter, found it to be racially insensitive and insulting, and made the recommendation for Ms. Herron

to be separated from her employment with Carhartt, or at the very least, that she be moved off the team immediately.

279. The statement made by Ms. Herron was the very same type of discriminatory and hostile actions that led to Plaintiff and other Black Carhartt employees to express their concerns and objections to Ms. Herron being placed on Plaintiff's team.

280. Plaintiff communicated Dinardo's recommendation to Defendant Corley.

281. Defendant Corley did not provide further direction on the matter, nor did he follow Dionardo's recommendation.

282. Plaintiff kept complaining to Defendants about the situation and the racially hostile comment that was made and requested that a formal investigation be initiated.

283. Defendants did nothing and took no action for approximately 40 days.

284. At some point after the comment was made and Black employees expressed their complaints about it, Defendants retained an

external law firm, Foley & Lardner LLP, apparently to conduct an investigation into the Carhartt employees' complaints, including Plaintiff's complaint, about the racially offensive "tap dancing" comment made to the Black female co-worker on Plaintiff's team, as well as the history of other racially insensitive actions.

285. Plaintiff was interviewed by Foley & Lardner attorney Philip B. Phillips.

286. The interview of Plaintiff by attorney Phillips occurred during last week of April 2026.

287. The interview of Plaintiff by attorney Phillips took place at Carhartt's headquarters in Dearborn, Michigan (i.e. the building where the cotton field was prominently displayed).

288. The cotton field was on display in the Carhartt lobby when attorney Phillips interviewed Plaintiff.

289. The only two people physically present for Plaintiff's interview were attorney Phillips and Plaintiff, but attorney Phillips did have a female assistant participate via Zoom.

290. The length of the meeting was scheduled to be for one hour.

291. However, the meeting between attorney Phillips and Plaintiff went beyond one hour.

292. During the meeting, Plaintiff responded to attorney Phillip's questions and provided her experiences, observations, concerns, issues with and complaints relating to the racially discriminatory behavior and racially hostile actions occurring Carhartt, including the "tap dance" comment.

293. Attorney Phillips did not inform Plaintiff one way or the other as to whether the meeting was being audio recorded.

294. Attorney Phillips stated during the meeting that someone had made the statement that Carhartt was a racist company.

295. The next day, attorney Phillips followed up with Plaintiff via a Zoom meeting about issues relating to promotion, or lack thereof, for employees within Plaintiff's team.

296. Plaintiff provided responses to attorney Phillips questions and told him that certain employees on his team should have received

promotions but did not, while other less deserving white employees did receive promotions.

297. Plaintiff explained the concerns and complaints that she had with Carhartt's culture, leadership, racial demographics, restructuring processes and promotions.

298. Neither Defendants, Foley & Lardner, nor attorney Phillips ever shared the findings of attorney Phillip's investigation with Plaintiff.

299. Defendants Valade and Hubbard were also aware of the horrific instances of racial discrimination in the widespread failures to promote qualified Black employees at Carhartt, including Plaintiff, as well as the racially hostile environment that existed due to the posting of offensive images within the company that evoked slavery and were disseminated in the workforce, the offensive cotton field display in the Carhartt lobby that many Black employees professed their hurt, sadness, anger, outrage and frustration over having to be subjected to it every day when coming and going into the office, and the grotesquely racial comment by asking a Black employee if she could "tap dance" to entertain their white audience.

300. Despite Defendants Valade and Hubbard having awareness at the highest levels of Carhartt of the ongoing racial concerns, issues and complaints, they failed to take any remedial action or meaningful steps to address or correct the issues and discrimination affecting Black employees at Carhartt.

301. None of the Defendants, including Valade and Hubbard, ever apologized to any Black Carhartt employee regarding any of the instances or occurrences set forth in this Complaint.

**Severe and Pervasive Sexual Harassment by Plaintiff's Direct Supervisor**

302. Independent of and concurrent with the instances of racial hostility set forth herein, Plaintiff was subjected to an ongoing, severe, and pervasive environment of sexual harassment engineered directly by her supervisor, Defendant Corley.

303. Defendant Corley repeatedly made explicit, unwanted, and offensive comments directed toward Plaintiff of a sexual nature and in a sexual manner during her tenure.

304. Coworkers noticed that Defendant Corley was attracted to Plaintiff, and they often made comments to Plaintiff about his creepy and sexually inappropriate conduct toward her, noting moments when he would leave her notes in her office, when he would seek her out to be in close proximity which was very uncomfortable, that he would make inappropriate comments to her, and that he made unreasonable requests that she travel to be in the office when it was not warranted, just so he could be near her.

305. Defendant Corley also made sexually offensive comments in the workplace wherein her would refer to Carhartt employee Defendant Fencyk as his “handler,” inferring that she would provide him sexual favors in exchange for advancement.

306. In a steady and continuous manner during Plaintiff’s employment with Carhartt, Defendant Corley made repeated sexual references regarding Plaintiff's physical characteristics, including explicit comments about her lips, how her lipstick made her look nice, and inferring what sexual acts 'they would be good for.'

307. Defendant Corley further subjected Plaintiff to humiliating verbal sexual advances, including explicit comments and references regarding 'table dancing.'

308. This offensive conduct was severe, continuous, and unwelcome, creating an abusive, sexually hostile work environment that altered the terms and conditions of Plaintiff's executive employment with Carhartt.

**Defendants' Unlawful, Intentional and Retaliatory Termination of Plaintiff's Employment**

309. Merely a few weeks after Plaintiff voiced her complaints during her participation in the legal investigation that was conducted by attorney Phillips of Foley & Lardner about the racial discrimination and racially hostile environment that existed at Carhartt, which was legally protected activity, including Plaintiff objecting to racially based rating disparities, failures to promote based on race, other adverse actions based upon race, Plaintiff's reporting or complaining about the 'tap dancing' comments, and Plaintiff's objection and opposition to the corporate slavery imagery that was prevalent within the Carhartt workplace,

Defendants abruptly and without cause terminated Plaintiff's employment on June 8, 2026.

310. Plaintiff was informed of her termination by Defendant Corley via a Teams meeting.

311. The meeting lasted approximately 15 minutes.

312. At some point during the meeting, Shanda from Carhartt's HR joined the Teams meeting.

313. Shanda was not present or in the meeting during the first part of the meeting, particularly when Defendant Corley informed Plaintiff that her employment with Carhartt was being terminated.

314. Prior to her termination, Plaintiff was never placed on a Performance Improvement Plan of any kind during her employment with Carhartt, nor did she receive any type of discipline.

315. To hide their illegal and retaliatory motives, Defendants asserted a fraudulent, boilerplate corporate pretext, that Plaintiff's position was being eliminated.

316. The 'position elimination' alibi for Plaintiff's termination was entirely false, inconsistent, and legally bankrupt, as Plaintiff was the single, solitary individual terminated at that time, completely outside the scope of any legitimate, structured job elimination or Reduction in Force (RIF).

317. At the time of Plaintiff's termination, Carhartt was enjoying billions of dollars in global sales and historic profitability, completely eliminating any financial or economic necessity to eliminate a vital VP role, wherein the VP (Plaintiff) was a stellar performer.

318. Despite knowing exactly how to structure a good-faith, VP-level separation, as evidenced by the one-year salary, bonus, and benefits packages handed to white VPs only twelve months prior, Defendants hit Plaintiff with an insulting, punitive baseline proposal amounting to a small portion of that standard.

319. A genuine copy of the separation package Defendants provided to Plaintiff upon her termination is attached hereto as **Exhibit 8**.

320. Defendants used this massive financial markdown as a direct corporate weapon to penalize, silence, and humiliate Plaintiff for having the audacity to oppose corporate racial animus and blowing the whistle on widespread civil rights violations at Carhartt.

**Contractual Breach and Retaliation Against Plaintiff**

321. Carhartt's post-termination position regarding compensation obligations to Plaintiff is also inconsistent with the company's own treatment and representations regarding executive separation arrangements.

322. In March 2025, Chief Executive Officer Defendant Hubbard communicated separation-related terms that reflected a broader executive compensation and transition framework, including continued salary, incentive compensation considerations, long-term incentive compensation, medical benefits, and executive search support. (See **Exhibit** 4).

333. These representations are significant because they demonstrate that Carhartt itself recognized that executive-level separation arrangements extend beyond base salary alone and include

the broader components necessary to appropriately address the transition of senior leaders.

334. Despite this prior recognition, Carhartt took a position against Plaintiff that sought to narrowly limit its obligations by excluding components of compensation that are central elements of Plaintiff's executive compensation package.

335. Carhartt cannot simultaneously recognize the importance of these compensation components in executive transition discussions while now asserting that such components are outside the scope of its' obligations to Plaintiff.

336. The inconsistency between Carhartt's prior executive separation approach and its position to Plaintiff further supports Plaintiff's position that the company has improperly minimized its contractual and financial obligations to her, especially due to Plaintiff's race and in retaliation for her complaints (including those made to attorney Phillips).

337. As a direct and proximate result of Defendants' aforesaid acts of racial discrimination, failure to promote due to race, hostile

environment due to race, the severe and pervasive sexual harassment that Plaintiff was subjected to, and the abrupt retaliatory termination of Plaintiff, has caused Plaintiff to suffer profound economic damages, severe emotional distress, mental anguish, humiliation, anger, depression, anxiety, frustration, and sadness, which have severely disrupted her health, dignity, and executive career path, and which such damages will continue into the future.

## COUNT I

## RACE DISCRIMINATION AND

## HOSTILE WORK ENVIRONMENT

## (42 U.S.C. § 1981)

338. Plaintiff realleges and incorporates by reference each and every allegation contained in this Complaint as though fully set forth herein.

339. Plaintiff is a member of a protected class based upon her race (Black).

340. Defendants intentionally discriminated against Plaintiff on the basis of her race in the terms, conditions, and privileges of her employment, in direct violation of 42 U.S.C. § 1981.

341. Defendants actively created, condoned, and maintained a severe and pervasively hostile work environment by officially publishing, promoting, and permitting horrific slavery-era iconography depicting a Black woman in a cotton field, a racially hostile corporate lobby displaying a cotton field, racist language, troupes and hostile behavior, and forcing Plaintiff to endure this imagery and such behavior as a condition of her executive employment.

342. Defendants further discriminated against Plaintiff by applying a flagrant racial double standard in corporate benefits, metrics, and separations: rewarding white VPs with promotions and full one-year severance packages, while subjecting an exemplary Black female VP to an unmerited performance downgrade, systematic demotion, and a microscopic fraction of the severance standard.

343. The discriminatory actions of Defendants were undertaken with malice and reckless indifference to Plaintiff's federally protected civil rights and due to Plaintiff's race.

344. As a direct and proximate result of Defendants' racial discrimination, Plaintiff has suffered and continues to suffer substantial economic losses, loss her annual compensation structure, loss of bonuses, catastrophic career disruption, and severe emotional distress and mental anguish. Plaintiff is also entitled to substantial punitive damages from Carhartt and each of the individual Defendants.

## COUNT 2

## RACE DISCRIMINATION AND

## HOSTILE WORK ENVIRONMENT

## (Michigan Elliott-Larsen Civil Rights Act - MCL 37.2101 et seq.)

345. Plaintiff realleges and incorporates by reference each and every allegation contained in this Complaint as though fully set forth herein.

346. Plaintiff is a member of a protected class based upon her race under the Michigan ELCRA.

347. Defendants, as employers and/or agents under the Act, held a statutory duty not to discriminate against Plaintiff regarding compensation, terms, conditions, or privileges of employment based on race.

348. Defendants breached this duty by subjecting Plaintiff to a racially hostile work environment through the official dissemination and tolerance of slavery-era imagery, maintaining a corporate culture of systemic bias, and executing a discriminatory wrongful termination masquerading as a fake job elimination.

349. Under the ELCRA, compensatory damages for emotional distress, humiliation, mental anguish, and loss of professional reputation are entirely uncapped.

350. As a direct and proximate result of Defendants' unlawful race discrimination under Michigan state law, Plaintiff has sustained massive economic damages, financial career destruction and profound emotional distress related injuries.

## COUNT 3

## RETALIATION AND WRONGFUL TERMINATION

## (42 U.S.C. § 1981 and Michigan ELCRA)

351. Plaintiff realleges and incorporates by reference each and every allegation contained in this Complaint as though fully set forth herein.

352. Plaintiff engaged in clear, legally protected opposition activity under both federal and state law when she formally opposed corporate slavery iconography, objected to discriminatory performance-rating manipulation, and championed the civil rights complaints of her Black co-workers to executive leadership, as well as all of the other racially discriminatory and retaliatory facts set forth above.

353. Defendants were fully aware of Plaintiff's protected opposition activity and complaints.

354. Merely a few weeks after Plaintiff made these reports and explicitly stated she agreed with the complaints, Defendants launched a targeted, retaliatory ambush, executing her sudden termination, fabricating a position elimination, and providing her with a severance

package that was substantially less than what was Carhartt's historical VP baseline which was provided to white similarly situation employees.

355. The close temporal proximity between Plaintiff's protected reports and her termination constitutes overwhelming evidence of a retaliatory motive.

356. The individual Defendants named herein are personally liable under Section 1981 because they directly participated in, engineered, and/or tacitly approved this rapid retaliation to silence a high-level whistleblower that made significant and repeated complaints of racial discrimination, a racially hostile work environment and retaliation against the Black workers at Carhartt.

357. As a direct and proximate result of Defendants' retaliatory acts, Plaintiff has suffered immense, multi-million-dollar economic damages, loss of future earning capacity through retirement, and severe mental anguish and emotional distress damages. Plaintiff is also entitled to substantial punitive damages from each of the Defendants.

## COUNT 4

## SEXUAL HARASSMENT AND HOSTILE WORK ENVIRONMENT

## (Michigan's ELCRA)

358. Plaintiff realleges and incorporates by reference each and every allegation contained in this Complaint as though fully set forth herein.

359. Plaintiff is a female and a member of a protected class under the Michigan ELCRA.

360. Plaintiff was subjected to repeated, explicit, and unwelcome communication and conduct of a sexual nature by her direct supervisor, Defendant Todd Corley, including derogatory comments about her lips, sexual performance references, and offensive remarks regarding table dancing.

361. This continuous conduct was explicitly unwelcome, offensive, and sufficiently severe and pervasive to create an intimidating, hostile, and abusive working environment that altered the conditions of her executive employment.

362. As a direct and proximate result of the severe sexual harassment condoned by Defendants, Plaintiff has suffered substantial non-wage tort damages, severe mental and emotional distress, depression, anxiety, and deep humiliation.

## COUNT 5

## BREACH OF CONTRACT

363. Plaintiff realleges and incorporates by reference each and every allegation contained in this Complaint as though fully set forth herein.

364. Plaintiff and Defendant Carhartt entered into an Employment Agreement. (See **Exhibit 1**).

365. As set forth above, Defendant breached the Employment Agreement by failing to provide Plaintiff with all of the promised benefits, including those due upon her termination.

366. Plaintiff suffered substantial damages due to Defendant Carhartt's breaches of the parties' Employment Agreement.

## COUNT 6

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

367. Plaintiff realleges and incorporates by reference each and every allegation contained in this Complaint as though fully set forth herein.

368. As set forth above, Plaintiff was subjected to extreme and outrageous conduct by Defendants; Defendants' conduct was intentional and reckless; and Defendants' conduct caused Plaintiff severe emotional distress.

369. As a direct and proximate result of the unlawful actions by Defendants, Plaintiff has suffered substantial non-wage tort damages, severe mental and emotional distress, depression, anxiety, and deep humiliation.

## COUNT 7

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

370. Plaintiff realleges and incorporates by reference each and every allegation contained in this Complaint as though fully set forth herein.

371. As set forth above, Plaintiff was subjected to extreme and outrageous conduct by Defendant; Defendant's conduct was negligent; and Defendant's conduct caused Plaintiff severe emotional distress.

372. As a direct and proximate result of the unlawful actions by Defendants, Plaintiff has suffered substantial non-wage tort damages, severe mental and emotional distress, depression, anxiety, and deep humiliation.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants, jointly and severally, and award the following relief:

A. Award full compensatory economic damages, including back pay, bonuses, unvested perks, and multi-million-dollar front pay based on her annual baseline compensation modeled through retirement;

B. Award full, completely uncapped non-wage tort compensatory damages under Section 1981 and the Michigan ELCRA for all forms of emotional distress, mental anguish, depression, humiliation, and severe loss of professional reputation;

C. Award massive, uncapped punitive damages of at least $100 Million against Defendant Carhartt under 42 U.S.C. § 1981, or whatever different amount as scaled directly to Carhartt's annual sales footprint and corporate value, to effectively punish and deter future corporate civil rights violations;

D. Award massive, uncapped punitive damages in the Millions of dollars against each of the individual Defendants under 42 U.S.C. § 1981, or whatever different amount as scaled directly to their respective individual net worth, to effectively punish and deter future corporate civil rights violations;

E. Award Plaintiff reasonable attorney's fees, expert witness fees, litigation expenses, and statutory and/or common law interest pursuant to statutory fee-shifting provisions under federal and state civil rights laws set forth herein; and

F. Award any such other, further legal or equitable relief as this Court deems just and proper.

Respectfully submitted,

*/s/ Thomas R. Warnicke*
Thomas R. Warnicke (P47148)
Attorney for Plaintiff
Law Offices of Thomas R. Warnicke, PLLC
30200 Telegraph Road, Suite 102
Bingham Farms, MI 48025
(248) 410-3031
tom@warnickelaw.com

November 6, 2026

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all counts and issues so triable in this action.

Respectfully submitted,

*/s/ Thomas R. Warnicke*
Thomas R. Warnicke (P47148)
Attorney for Plaintiff
Law Offices of Thomas R. Warnicke, PLLC
30200 Telegraph Road, Suite 102
Bingham Farms, MI 48025
(248) 410-3031
tom@warnickelaw.com

Dated: November 6, 2026

# EXHIBIT 1

# EMPLOYMENT AGREEMENT

This Employment Agreement is entered into between Carhartt, Inc. (referenced to herein as both the "Company" and "Carhartt") and [redacted] and sets out the general terms o[redacted] employment, duties, compensation, and other conditions of employment as follows:

1. **Effective Date and Term**. This Agreement is effective as of June 6, 2022, and shall be continued indefinitely, unless terminated by either party with ninety (90) days' written notice or, in lieu of notice by Carhartt, payment of [redacted] base salary for the 90-day notice period. The base salary will be the only compensation provided in the notice period. [redacted] agrees to cooperate fully in the transition of their responsibilities during any 90 days' notice or lieu of notice period.

2. **At-Will**. The employment is at-will and can be terminated by either party with or without cause subject to the terms of this Agreement.

3. **Position and Duties**. [redacted] will continue employment with Carhartt as the Vice President of Global Talent Management ("Vice President Global Talent Mangement"). [redacted] will be expected to perform such duties and responsibilities as are commensurate with the title and position of Vice President of Global Talent Management and to follow the direction of Carhartt's SVP of HR, Facilities, Security, Safety and the Board of Directors.

[redacted] agrees to serve Carhartt faithfully and to the best of their ability and to devote full business time, attention and efforts to Carhartt's business, financial, and administrative affairs during their employmen[redacted] agrees to comply with and be bound by such employment-related policies and practices as the Company implements, including without limitation the policies and procedures contained in the Carhartt Employee Handbook. In addition[redacted] agrees to comply with and be bound by all of the Company's policies and procedures regarding confidential information and relating directly or indirectly to the business, products, practices or techniques of the Company.

4. **Compensation and Benefits**. [redacted] will be provided the following compensation and benefits:

(a) Base Salary. [redacted] will be paid an annual base salary of $265,000 less all applicable federal and state withholding taxes, and payable in equal installments through the Company's normal payroll schedule. The base salary will be reviewed annually and is subject to change at the discretion of the Board of Directors.

(b) Annual Incentive. [redacted] will be eligible for a target of 40% annual incentive bonus and a target merit increase of 4% annually. The annual incentive bonus and merit increase would be paid during the normal incentive cycle for that year[redacted] is eligible for VP level annual LTIP at a target of 45% , an

enhanced award and VP level automobile reimbursement. The Annual Incentive is not a guaranteed bonus for any year.

(c) Benefits. [redacted] shall receive medical, dental, life, disability, and 401k benefits.

5. **Severance.** In the event that Carhartt terminates [redacted] employment without cause, Carhartt shall continue to pay [redacted] their base salary for sixty (90) days following the termination of their employment and any notice period if the terminates occurs between 0-3years. If the termination occurs after 3years of service, Carhartt shall pay [redacted] 6 weeks of paid salary per year worked and any notice period for up to 10years of service. Carhartt shall also pay [redacted] annual bonus, LTIP and any enhanced awards for which she is eligible. The preceding severance payments are contingent upon [redacted] executing a release of claims satisfactory to Carhartt and [redacted] compliance with this Agreement including paragraphs 6, 7 and 8.

6. **Nondisclosure and Protection of Proprietary Information**. [redacted] acknowledges that they will have access to the Company's Proprietary Information as defined below. [redacted] covenants to hold in the strictest confidence and not disclose to any person, firm, corporation or other entity any of the Company's Proprietary Information, except as such disclosure may be required (a) in connection with [redacted] work for the Company, (b) as expressly authorized by Company policies in effect from time to time, or (c) as required by law or pursuant to court order. [redacted] understands that this non-disclosure obligation continues after termination of this Agreement for any reason.

For the purposes of this Agreement, the term "Proprietary Information" shall include information concerning the Company's and any affiliates' management, production design, engineering, finances, processes, manufacturing, marketing, project management, purchasing, research and development, sales, formulae, all current and future products and product plans, computer software, technology, product and service prices and discounts, identity of materials and product sources, operating costs, ideas, drawings and technical data, financial data and plans, identity of actual, former or potential employees, personnel information, customers, vendors, or suppliers, customer specifications and job requirements, proposals and bidding information, and any other information concerning the business of Carhartt, its affiliates, customers, vendors, and suppliers in any way which is of a confidential or proprietary nature whether disclosed verbally or in writing.

[redacted] shall indemnify and hold harmless the Company, and its affiliates from any loss, claims or damages, including without limitation, all attorneys' fees, costs and expenses, arising out of or relating to any unauthorized disclosure of Proprietary Information or failure to return all Proprietary Information in the possession of or controlled by [redacted] which indemnification shall be in addition to and not in lieu of all other remedies Company may have hereunder, under applicable laws or in equity.

7. **Assignment of Work Product**. [redacted] agrees that any use of their skills and abilities in performance of duties for Carhartt which results in the development, creation or making of new and useful ideas, discoveries, improvements, modifications, inventions and original works of authorship (whether or not patentable or copyrightable) ("Work Product") relating to the business of Carhartt shall be deemed a "work made for hire" under the intellectual property laws and shall be owned by Carhartt.

[redacted] hereby assigns and transfers their right, title and interest in and to such Work Product, together with all related intellectual property rights, including, but not limited to, copyrights, patents, and trade secrets, to Carhartt. [redacted] further agrees that upon the request of Carhartt, they will execute and deliver during the term of employment and any time thereafter, all documents and do all acts considered by the Company to be reasonably necessary to secure to Carhartt the entire right, title and interest in and to said Work Product, including without limitation, documents and acts related to applications for and/or Letters Patent of the United States, and foreign countries, and copyrights ("Patent Documents"). The cost of preparing such Patent Documents, including assignments and applications for Letters Patent, the prosecution and maintenance of said applications for and/or Letters Patents, and all proceedings and litigation in connection therewith, shall be borne by Carhartt.

[redacted] agrees to disclose promptly to the Company officers to whom they report, all information relating to any and all Work Product relating to the business of Carhartt which he may discover, invent or make, either solely or jointly with others, whether during working hours or otherwise.

8. **Noncompetition and Nonsolicitation**. During the time this Agreement is in effect and during the periods defined below following the termination of this Agreement for any reason or on any grounds, [redacted] covenants not to:

(a) for a period of 6 months following termination of this Agreement for any reason whatsoever, be involved or interested, whether alone or together with or on behalf of or through any other person or entity whether as a sole proprietor, partner, shareholder, agent, officer, director, employee, advisor, consultant, trustee, beneficiary or otherwise, in the following companies: Under Armour, Nike, Dickies, Cabelas, Tractor Supply Company, Duluth, Columbia, Ariat, or any other apparel company that is considered a direct competitor, defined as any apparel company that produces work wear and/or uniforms ("Competing Entities").

(b) for a period of 6 months following termination of this Agreement for any reason whatsoever, call upon, solicit, sell or attempt to sell, in connection with any Competing Entity, any service or product to any customer of Carhartt with which Fields-Johnson had contact during their last two years of employment with the Company, or influence or attempt to influence any such customer of Carhartt to terminate or modify any written or oral agreement or course of dealing with the Company; or

(c) for a period of 6 months following termination of this Agreement for any reason whatsoever, in connection with any Competing Entity, call upon, solicit, or seek to purchase services or products from, any vendor or supplier of Carhartt with which [redacted] had contact during [redacted] last two years of employment with the Company, or influence or attempt to influence any such vendor or supplier of Carhartt to terminate or modify any written or oral agreement or course of dealing with the Company;

(d) for a period of 12 months following termination of this Agreement for any reason whatsoever, solicit or attempt to hire, influence, or otherwise direct any employee of the Company to leave the Company's employment.

(e) [redacted] understands that Carhartt offers unique technologies and services to the global market and that therefore it is reasonable to apply the covenants contained herein to [redacted] activities throughout the world and without geographic restriction.

(f) The parties acknowledge that the type and periods of restrictions imposed in the provisions of paragraph 8(a) through (e) above are fair and reasonable and are reasonably required for the protection of the legitimate interests of Carhartt. If any of the covenants, or any parts thereof, in paragraph 8 are hereafter construed to be invalid or unenforceable, the same shall not affect the remainder of the covenant or covenants, which shall be given full effect, without regard to the invalid portions. In the event that any covenant contained in this Agreement shall be determined by any court of competent jurisdiction to be unenforceable by reason of its being too extensive in any respect, it shall be interpreted to extend only to the maximum extent to which it may be enforceable, all as determined by such court in such action.

9. **<u>Equitable Relief</u>**. The parties acknowledge that each would suffer unique and irreparable injury in the event of a breach of the covenants contained in paragraphs 6, 7 and 8 of this Agreement, which breach could not be adequately compensated by the payment of damages. Accordingly, in the event of any such breach of the covenants contained in paragraphs 6, 7 and 8 the parties agree that this Agreement may be enforced by a decree of specific performance or an injunction, as well as damages and that any remedy which the parties might have at law would be inadequate. Therefore, in the event of a breach of these paragraphs, the parties shall not be required to follow the arbitration procedure of paragraph 11 prior to seeking equitable relief hereunder.

10. **<u>No Conflicts</u>**. Carhartt is entering into this Employment Agreement based upon its understanding that [redacted] is free to enter into and perform under this Employment Agreement. Accordingly, recognizing that Company will rely upon this representation, [redacted] represents and warrants to Carhartt that [redacted] is: (a) not party to any other non-competition agreement that would violate any term of this Employment Agreement; (b) under no obligation or commitment, contractual or otherwise, that would prohibit or prevent him from entering into this Employment Agreement; and (c) free to enter into and perform all of her duties and obligations under this Employment Agreement.

11. **Arbitration**. Except as provided above, any controversy or claim arising out of or relating to this Agreement, the breach hereof, o[redacted]employment by the Company, including without limitation wrongful termination, whistleblower, or discrimination claims, will be submitted to binding arbitration in accordance with the Employment Arbitration Rules and Procedures then in effect of the American Arbitration Association ("AAA"). The party seeking arbitration must provide written notice to the opposing party of the intent to arbitrate claims. Arbitration will take place at a location near or around Carhartt's offices in Michigan.

The parties shall select a single arbitrator who is mutually satisfactory to them from a list provided by the American Arbitration Association. If the parties are unable to agree on an arbitrator, they shall choose an arbitrator through the rules applied by AAA for the selection of arbitrators. The arbitrator shall apply the law of the State of Michigan or the federal law of the United States of America, or both, as applicable to the claims asserted. The award of the arbitrator shall be binding and final on all parties. Judgment upon the award rendered may be entered in any court having jurisdiction thereof. The arbitrator's fee and costs shall be divided equally between the parties.

12. **Governing Law**. This Agreement is to be construed under the laws of the State of Michigan without regard to its conflict of law's provisions.

13. **Entire Agreement; No Amendment**. This Agreement contains the entire understanding between the parties hereto with respect to the subject matter hereof and supersedes any prior understandings, agreements or representations, written or oral, relating to the subject matter hereof. Further, this Agreement supersedes any Company policies (including those contained in the Company's Handbook) to the extent such policies conflict with this Agreement. The terms of this Agreement may not be amended or modified unless done so in writing and signed by the Company and Fields-Johnson.

CARHARTT, INC.

By: ______________________

Its: SVP HR

Dated: ______________________

[redacted]

Address

Dated: 12/1/2022

# EXHIBIT 2

# DEI Leadership Racial Demographics

May 2024

carhartt



# AGENDA

1. Creating a Safe Space
2. Our Overall Challenges
3. Breakdown of Leadership Racial Demographics
4. Leadership Tenure Data
5. **Engagement** Survey Insights
6. Strategies & Commitments
7. Actions & Next Steps

carhartt


Breakdown of Leadership Racial Demographics
Leadership Representation
15%
Diverse Representation
White Ethnic ID
85%
Black/ African American Ethnic ID
6%
Hispanic Ethnic ID
5%
Asian Ethnic ID
3%
Two or More Races Ethnic ID
>2%
American Indian/ Alaskan Native Ethnic ID
>1%
KEY
Ethnic ID Focus
Other Diverse Ethnic IDs
White Ethnic ID

# Leadership Tenure Data

| 5 Years or Less | 10 Years or Less | 15 Years or Less | 20 Years or Less | 20 Years or More |
|---|---|---|---|---|
| 34% Diverse Representation | 12% Diverse Representation | 5% Diverse Representation | 12% Diverse Representation | 7% Diverse Representation |
| • 53 Diverse Demographic<br>• 105 White Ethnic ID<br>• 66% White Leadership Demographic | • 24 Diverse Demographic<br>• 176 White Ethnic ID<br>• 88% White Leadership Demographic | • 5 Diverse Demographic<br>• 93 White Ethnic ID<br>• 95% White Leadership Demographic | • 5 Diverse Demographic<br>• 36 White Ethnic ID<br>• 88% White Leadership Demographic | • 6 Diverse Demographic<br>• 85 White Ethnic ID<br>• 93% White Leadership Demographic |

KEY
- Diverse Demographic
- White Ethnic ID

- This data digs deeper into our insights regarding disparity impacts.
  - o Disparity impacts can be due to consistent practices that create a domino effect which may be unintentional and unknown.
- Most of our diverse leadership population has been with the organization for less than 5 years.
  - o With the average market tenure being 4 years, this group is most at risk to leave the company if we don't focus on retaining our diverse talent.

# Our Overall Challenges

**Leadership Representation**




85% White Ethnic ID

## DATA INSIGHTS

- 85% of our leadership throughout the organization represents our white population.
- The lack of diversity in leadership indicates systemic barriers and/ or biases that prevent individuals from underrepresented racial/ ethnic backgrounds from accessing leadership roles.
  - Disproportioned representation of non-white leaders suggests we may have barriers and/ or bias practices in place in hiring, promotion, and development.
- The lack of representation contributes to blind spots in decision making and perpetuates inequalities.
- Our underrepresented population on average has been with the organization for less than 5 years.
  - In today's market the average employee has an average tenure of 4 years or less. This makes is more likely this population will leave the org.
  - Since this focus is on leadership roles, it can become harder to find the skills, competencies, and experiences this diverse talent population possesses.
- As we plan for succession we should consider:
  - The average leadership tenure is 10 to 15 years
  - If we fill leadership roles with successors we have identified, it could take 10+ years before diverse talent fills these roles.
- We must be diligent in change management when making organizational changes that could cause disparity impacts
  - Our diverse population is small and short in tenure, with this we must be sensitive during times of change and dig deep to understand domino effects.

## Creating a Safe Space

This is a space for us to have open honest dialogue as we address these sensitive challenges. It's a learning experience for all of us. We ask you to:

- Be open
- Empathize
- Collaborate
- Learn
- Actively listen
- Commit to change and take action
- Resist resistance

This will be a no judgement zone.



# Engagement Survey Data Highlights

- Engagement data included in appendix of this presentation gave us insight into leader sentiment within our diverse population.
- We focused our questions on the topics of respect, diversity, and engagement.
  - We are trending down in majority of these areas.
- All diverse leadership talent together doesn't look much different from the rest of our population that took the survey
- Although the data isn't extremely different from the rest of the population it is important to keep risk of loss in mind and their intent to stay is trending down
  - -9 point drop
- Digging deeper to gain insights based on tenure has revealed the following:
  - Leaders within our diverse demographic that have been with the company between 5-10 years scores dropped significantly
  - Intent to stay -19 points
  - Respect -19 points
  - Diversity valued -7
  - Environment where people with different backgrounds can succeed, -22
  - This leadership population makes up about 12% of our diverse demographic
- Review the appendix section for further details and insights



# Strategies & Commitments – DEI & GTO

**Desired Diverse Leadership Representation**

**30%**

Diverse Representation

## What We Will Do

- We must prioritize this work
  - Regular cadence to discuss our efforts
  - Socialize our efforts throughout the organization
  - Actions and accountability from each of our SLT members
- We strongly recommend partnering with DEI and GTO to complete discovery on our following processes to analyze for the presence of bias and barriers:
  - Recruiting process(es) end to end
  - What does our talent pipeline look like
  - Where are we recruiting
  - Partner with TA on University partnerships
  - Partner with HROPS on Promotion criteria and/ or practices
  - Review historical performance rating data
  - Reward and recognition processes/ practices
  - Development programs (within departments and/ or within HR)
  - Conduct focus groups with our diverse leadership talent to gain their perspective
- Our ongoing Project within GTO, Performance Management Optimization is another lever we will pull to build proper practices that support our diverse talent.
  - Performance rating model
  - Development planning
  - Overall performance management
  - Coaching & feedback



# Strategies & Commitments – DEI & GTO + SLT

**Desired Diverse Leadership Representation**

**30%**

Diverse Representation

## What We Will Do

- We highly recommend focuses on retention strategies or this population even if we perceive them to be low risk of loss.
  - Most diverse talent has been with the org for less than 2-5 years.
  - Market average is currently 4 years of tenure.
- We recommend having discussions around hiring diverse talent successors or filling the roles with internal talent.
- Place an emphasis to what the roadblocks to success are for this talent
- Use AI to help determine bias
- Mentorship programming
  - Sponsorship
- Agree to be deliberate at recruiting and hiring diverse talent.

Proposed SLT Commitments & Actions

- Relook at succession and determine how to prepare diverse talent for leadership roles.
- Succession planning and talent pipeline needs to include racial and diverse talent who are ready now or ready later.
- Identify racial and diverse talent for high profile projects. Provide talent with a mentor/sponsor and adequate support to rebrand talent and ensure success.
- LATER Action- DEI Dashboard metrics by SLT Leader



# Action & Next Steps

**- Alignment**

We want to ensure that the strategies and commitments we discussed today resonate with all of us, as there are important actions each of us will need to own and drive.

**- Discovery**

We will need to map out a timeline for discovery work to understand what barriers to success we have when it comes to attaining our DEI goals. GTO will partner with DEI and own this action item.

**- Socialization**

To bring all leadership levels along it will be important to socialize our strategies with them and help them understand what their part will be in the work.

**- Meeting Candence**

Regular meeting cadences will be needed to track and provide updates on our efforts:

1. Bi-weekly to Monthly DEI & GTO Meeting
2. Monthly to Bi-monthly SLT, DEI, GTO Meeting


THANK YOU

# Appendix



# Engagement Survey Insights

These graphs show data for survey questions we dropped in from 2023 to 2024. Population included in this data are all people leaders within our diverse groups.

I believe Carhartt will do all it can to support my job security




- -16 point drop between 2023 and 2024
  - 2023- 90% strongly agree/ agree , 8% neutral, 2% disagree/ strongly disagree
  - 2024-74% strongly agree/agree, 23% neutral, 4% disagree/ strongly disagree

Taking everything into account, I would say this is a great place to work.




- -9 point drop between 2023 and 2024
  - 2023- 98% strongly agree/ agree , 2% neutral
  - 2024-89% strongly agree/agree, 6% neutral, 5% disagree/ strongly disagree

I intend to stay with this company for at least the next 12 months.




- -9 point drop between 2023 and 2024
  - 2023- 95% strongly agree/ agree , 5% neutral
  - 2024-86% strongly agree/agree, 11% neutral, 3% disagree/ strongly disagree

I feel that I am part of a team.




- -8 point drop between 2023 and 2024
  - 2023- 97% strongly agree/ agree , 3% neutral
  - 2024-89% strongly agree/agree, 9% neutral, 2% disagree/ strongly disagree

Key
- Strongly agree/ agree
- Neutral
- Disagree/ strongly disagree

NOTE: Our White leadership demographic data in these same categories are about the same with lower ratings in some questions and higher in others. Keep the risk of loss in mind with our diverse leadership talent.

# Engagement Survey Insights

These graphs show data for survey questions we dropped in from 2023 to 2024. Population included in this data are all people leaders within our diverse groups.




My work gives me a sense of personal accomplishment.




- 7 point drop between 2023 and 2024
  - 2023- 95% strongly agree/ agree , 2% neutral, 3% disagree/ strongly disagree
  - 2024- 88% strongly agree/agree. 6% neutral. 6% disagree/ strongly disagree

I am proud to work at Carhartt.




- 6 point drop between 2023 and 2024
  - 2023- 100% strongly agree/ agree
  - 2024- 94% strongly agree/agree, 3% neutral, 3% disagree/ strongly disagree

I trust the people on my team.




- -5 point drop between 2023 and 2024
  - 2023- 90% strongly agree/ agree , 8% neutral, 1% disagree/ strongly disagree
  - 2024- 74% strongly agree/agree, 23% neutral, 2% disagree/ strongly disagree

My current responsibilities are positioning me for further success within Carhartt. .




- -5 point drop between 2023 and 2024
  - 2023- 83% strongly agree/ agree . 13% neutral, 3% disagree/ strongly disagree
  - 2024- 78% strongly agree/agree, 14% neutral, 8% disagree/ strongly disagree

NOTE: Our White leadership demographic data in these same categories are about the same with lower ratings in some questions and higher in others. Keep the risk of loss in mind with our diverse leadership talent.

# Engagement Survey Insights: Tenure

These graphs show data for diversity survey questions we dropped in from 2023 to 2024. Population included in this data are all people leaders within our diverse groups that have been with the company 5-10 years.




I intend to stay with this company for at least the next 12 months.




- -19 point drop between 2023 and 2024
  - 2023- 95% strongly agree/ agree , 5% neutral
  - 2024- 76% strongly agree/agree, 14% neutral, 10% disagree/ strongly disagree

I am treated with respect and dignity at work.




- -19 point drop between 2023 and 2024
  - 2023- 95% strongly agree/ agree , 5% neutral
  - 2024- 76% strongly agree/agree, 10% neutral, 14% disagree/ strongly disagree

At the company diversity is valued.




- -7 point drop between 2023 and 2024
  - 2023- 74% strongly agree/ agree , 16% neutral, 11% disagree/ strongly disagree
  - 2024- 67% strongly agree/agree, 24% neutral, 10% disagree/ strongly disagree

The company has created an environment where people with different backgrounds can succeed.




- -22 point drop between 2023 and 2024
  - 2023- 74% strongly agree/ agree , 16% neutral, 11% disagree/ strongly disagree
  - 2024- 52% strongly agree/agree, 29% neutral, 19% disagree/ strongly disagree

NOTE: Our white demographic in leadership shows more favorable data for these same questions, with some slight declines.

# Engagement Survey Insights

These graphs show data for survey questions we +/- in from 2023 to 2024. Population included in this data are all people leaders within our diverse groups.

Key
- Strongly agree/ agree
- Neutral
- Disagree/ strongly disagree

I can be myself at work.




- 2 point drop between 2023 and 2024
  - 2023- 80% strongly agree/ agree , 13% neutral, 7% disagree/ strongly disagree
  - 2024- 78% strongly agree/agree, 17% neutral, 5% disagree/ strongly disagree

I am treated with respect and dignity at work.




- +3 point drop between 2023 and 2024
  - 2023- 88% strongly agree/ agree , 8% neutral, 3% disagree/ strongly disagree
  - 2024- 91% strongly agree/agree, 3% neutral, 6% disagree/ strongly disagree

At the company diversity is valued.




- +9 point drop between 2023 and 2024
  - 2023- 69% strongly agree/ agree , 18% neutral, 13% disagree/ strongly disagree
  - 2024- 78% strongly agree/agree, 15% neutral, 6% disagree/ strongly disagree

The company has created an environment where people with different backgrounds can succeed.




- +12 point drop between 2023 and 2024
  - 2023- 63% strongly agree/ agree , 22% neutral, 15% disagree/ strongly disagree
  - 2024- 75% strongly agree/agree, 17% neutral, 8% disagree/ strongly disagree

NOTE: Our White leadership demographic data in these same categories are about the same with lower ratings in some questions and higher in others. Keep the risk of loss in mind with our diverse leadership talent.

# 9-Box Assessment Data: Directors

## Box 9

**4 of 5**

White Ethnic ID

- 5 Directors
  - 4 White Ethnic ID
  - 1 Hispanic/ Latino Ethnic ID
- 61 Directors total
  - 8% of our directors fall in box 8
  - 2% diverse talent considered HiPo (1 individual)

## Box 8

**6 of 6**

White Ethnic ID

- 6 Directors
  - All White Ethnic ID
- 61 Directors total
  - 10% of our directors fall in box 8

## Box 6

**10 of 14**

White Ethnic ID

- 14 Directors
  - 10 White Ethnic ID
  - 2 Hispanic/ Latino Ethnic ID
  - 2 Asian Ethnic ID
- 61 Directors total
  - 23% of our directors fall in box 6
  - 7% diverse talent considered core talent (4 individuals)

## Box 5

**19 of 23**

White Ethnic ID

- 23 Directors
  - 19 White Ethnic ID
  - 2 Hispanic/ Latino Ethnic ID
  - 2 Asian Ethnic ID
- 61 Directors total
  - 38% of our directors fall in box 6
  - 7% diverse talent is considered core talent (4 individuals)

## Box 2

**6 of 7**

White Ethnic ID

- 7 Directors
  - 6 White Ethnic ID
  - 1 Black/ African American Ethnic ID
- 61 Directors total
  - 11% of our directors fall in box 2
  - 2% diverse talent is considered medium/ low (1 individual)

KEY

Diverse Demographic

White Ethnic ID

Note: Currently, our VP population lacks diverse talent considered HiPo. We have only one VP representing a diverse demographic.

# 9-Box Assessment Data: VPs

| Box 9 | Box 8 | Box 6 | Box 5 |
|---|---|---|---|
| 3 of 3 White Ethnic ID | 2 of 2 White Ethnic ID | 8 of 8 White Ethnic ID | 3 of 4 White Ethnic ID |

- 3 VPs
  - All White Ethnic ID
- 2 VPs
  - All White Ethnic ID
- 8 VPs
  - All White Ethnic ID
- 4 VPs
  - 3 White Ethnic ID
  - 1 Black/ African American Ethnic ID

Note: Currently, our VP population lacks diverse talent considered HiPo. We have only one VP representing a diverse demographic.

KEY
Diverse Demographic
White Ethnic ID

# Our Current Rating Model

Rating Definitions & Points to Consider:

## Highly Effective

1. **Actions consistently surpass expectations,** exceeding role requirements and goals.
2. Embodies traits of an **exemplary Carhartt** Leader **in all facets.**
3. Showcases behaviors that **positively influence others,** the organization, and personal reputation.

## Effective

1. **Consistently meets role expectations** and **occasionally exceeds** goals.
2. **Proficiently** showcases **some or most qualities** of The **Ways of the Carhartt Leader.**
3. **Behaviors have a positive impact** on others, the organization, and personal reputation.

## Needs Improvement

1. **Consistently fails** to meet expectations or does so inconsistently.
2. **Goals are not achieved** and **lacks demonstration of The Ways of the Carhartt Leader** behaviors or skills.
3. **Adverse effects on others,** the organization, or the associate's reputation may result from these behaviors.

# Our Current Rating Model

## Points to Consider

### Highly Effective

1. Associate performs at a mastery level of their role.
2. They consistently exceed expectations and always go over and beyond expectations.
3. Associate demonstrated all competencies outlined in "The Ways," at a mastery level and moved business forward for the current FY.
4. Associate exceeded all goals for the current FY.

### Effective

1. Associate performs at a proficient level of their role.
2. They consistently meet expectations and may go above and beyond if the opportunity presents itself.
3. Associate is viewed as core talent and may show some potential of moving into a higher-level role including leadership.
4. Associate hit most if not all goals for the current FY.

### Needs Improvement

1. Associate performs below expectations required for their role.
2. They do not consistently meet expectations.
3. Associate is not viewed as core talent due to expectations not being met.
4. Associate's goals were not met.

# Performance Rating: Myths & Facts

Let's go over some common myths and facts of the annual performance review process.

| MYTH | FACT |
|---|---|
| Receiving an "effective" rating indicates a mediocre performance level. It suggests that the associate's performance is average, and they have not had a particularly strong year. | Being rated effective is a **GOOD** thing. It doesn't mean they are average or mediocre. If associates perceive an "effective," rating as negative, clarify its meaning. |
| Once an associate receives a "highly effective" rating, they should always be rated "highly effective." | An associate can be highly effective one year and move to effective the next, this is **normal** and **okay.** Explain that highly effective in one year doesn't guarantee it indefinitely. Roles and goals evolve, fostering growth opportunities. |
| An associate should receive the highest possible rating to offer them the **greatest incentive for recognition and reward.** | We should not **rate** performance **higher** to give an associate a **larger incentive** and/ or merit increase. It's crucial to recognize and reward associates throughout the year, rather than solely relying on the annual review for recognition. |
| Putting in **great effort** to achieve **expectations** of their role or business as usual tasks and/ or goals is a **great** reason to **rate** someone **highly effective.** | **Effort and excellence are expected.** Before rating someone as highly effective, assess whether you're acknowledging their effort or if they genuinely exceeded expectations. |

# EXHIBIT 3


SUSTAINABILITY
We better our landscape
INCLUSION
Every person's voice adds value.
COMMUNITY
Where we care about one another.
How informed and engaged are YOU
about our ISC strategies and priorities?
Amy Fencyk

# EXHIBIT 4

CONFIDENTIAL

HRLT Separation Program

Please find the following confidential HRLT separation program details for your consideration. The separation program includes the following:

- Only members of the HR leadership team are eligible
- 12 months of base pay
- Equivalent of 8 months bonus (STI/LTI) at target
- Benefits - if currently enrolled 12 months lump sum for COBRA
- Separation payments are not 401k eligible
- Outplacement services offered
- Last day of employment - March 21, 2025
- Employment may be extended at the Company's option based on business needs
- Response with decision is due by 5:00PM, Monday, March 3, 2025

A separation agreement must be signed to receive payment under this program.

**Decisions are due by 5:00PM, Monday, March 3, 2025:**

- Please communicate your decision via email to Linda Hubbard
- No extensions will be granted; all decisions are final
- Please do not share your decision with other members of the HRLT until all responses are received.

*The HRLT Separation Program is confidential and should not be discussed internally or externally*. Consultation with financial, tax or legal advisors is permitted provided confidentiality is maintained.

Please contact Linda Hubbard if you have any questions.

# EXHIBIT 5

# Position Description

- Title: Vice President, Talent Management
- Organization: Carhartt
- Reports to: SVP of HR
- Direct Reports: Talent Management, Learning & Development Team Members
- Location: Dearborn, MI/ Remote
- Website: carhartt.com



# EXHIBIT 6

Tue, Feb 17 at 10:13 AM

Olacoy Lawyer



# EXHIBIT 7

[redacted]

Carrie Herron 12:53

Sounds good.

OK.

Mhm.

Shayla, are you good at tap dancing in case they get bored?

Comments

Video settings

[redacted]

# EXHIBIT 8

Docusign Envelope ID: D1C605F8-CC52-8E9E-83F0-BD8A78869209

# CONFIDENTIAL SEPARATION AGREEMENT AND GENERAL RELEASE OF ALL CLAIMS

This Confidential Separation Agreement and General Release of All Claims ("Agreement") is made effective as of the Effective Date (as defined in Section 16 of this Agreement) and is entered into between Carhartt, Inc. ("Company") and [redacted] ("Employee"). The Company and the Employee are collectively referred to [redacted] "Parties" and each as a "Party".

## RECITALS

WHEREAS, Employee was employed by the Company as its Vice President of Global Talent Management pursuant to an Employment Agreement effective as of June 6, 2022 ("Employment Agreement");

WHEREAS, the Employee's employment was terminated without notice effective June 8, 2026;

WHEREAS, pursuant to Section 1 of the Employment Agreement, the Company must either provide the Employee with ninety (90) days' written notice of termination or, in lieu of notice, pay the Employee's base salary for the ninety (90) days' written notice period;

WHEREAS, ninety (90) days from June 8, 2026, is September 6, 2026 ("Notice Period");

WHEREAS, regardless of whether this Agreement becomes effective, the Company will continue to pay the Employee's base weekly salary of $5,820.87 during the Notice Period;

WHEREAS, pursuant to Section 5 of the Employment Agreement, if the Company terminates the Employee's employment without cause, the Employee is entitled twenty-four (24) weeks of her weekly salary, subject to the Employee executing a release of claims satisfactory to the Company;

WHEREAS, the Company and the Employee dispute whether cause exists to terminate the Employee's employment under the Employment Agreement; and

WHEREAS, the Company and the Employee desire to enter into this Agreement regarding the termination of Employee's employment.

**NOW, THEREFORE**, in consideration of the mutual covenants and promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby expressly acknowledged, and based on the foregoing Recitals (which are incorporated in this Agreement as acknowledgements, agreements, representations, warranties, and covenants of the respective Parties, as the case may be), the Parties agree as follows:

1. Separation Date/Re-Employment. The Employee's employment with the Company will terminate on June 8, 2026. The Employee shall neither seek nor accept employment with the

Company, its parent or any of its direct or indirect subsidiaries or affiliates, thereafter.

2. Monetary Consideration. In consideration of the Employee entering into this Agreement and complying with its terms and any other legal obligations the Employee owes to the Company, the Company will provide the Employee with the following benefits provided that: (i) the Employee timely signs and returns this Agreement to the Company and (ii) the revocation period set forth in Section 16 below expires without the Employee revoking the Employee's acceptance of this Agreement:

The Company agrees to pay the Employee (after they have signed this Agreement and the seven-day revocation period has expired) a total gross amount equal to twenty-four (24) weeks' wages equaling $139,700.88. This amount will be paid in twelve (12) equal bi-weekly installments starting with Carhartt's payroll check date of September 18, 2026. The gross wage amount will be subject to withholding of applicable federal and state taxes and other normal deductions. This amount shall not be considered "compensation" for purposes of determining any benefits provided for under any pension, savings, or other benefit plan maintained by the Company.

3. No Other Company Obligations. The Employee acknowledges that the only monetary consideration for signing this Agreement is that set forth in Section 2. The Employee also acknowledges that no other promises or agreements of any kind have been made to or with the Employee by any person or entity whatsoever in order to cause the Employee to sign this Agreement.

4. Wrongdoing Disclaimer. Neither the Company's signing of this Agreement nor any action taken by the Company toward compliance with the terms of this Agreement constitutes an admission by the Company that it has acted improperly or unlawfully with regard to the Employee or that it has violated any state, federal, or other applicable law.

5. Release and Waiver of Claims. For and in consideration of the above, the Employee releases the Company, all directors, officers, shareholders, agents, representatives, employees, successors and assigns of the Company and the Company's employee benefit plans and programs and their administrators and fiduciaries (the "Released Parties"), from any liability relating to all manner of action and causes of action, damages, costs or expenses (including related attorneys' fees) of any kind whatsoever, known or unknown, suspected or unsuspected, that the Employee may now have or has ever had against any of the Released Parties by reason of any act, omission, transaction, or event occurring up to and including the Effective Date of this Agreement, including but not limited to claims under the Age Discrimination in Employment Act ("ADEA") and the Older Workers Benefits Protection Act ("OWBPA"). ***The Employee is not waiving any rights the Employee may have to: (a) benefits and/or the right to seek benefits under applicable workers' compensation and/or unemployment compensation statutes; (b) pursue claims which by law cannot be waived by signing this Agreement; (c) enforce this Agreement; (d) any vested benefits; (e) file a charge or complaint with the U.S. Equal Employment Opportunity Commission ("EEOC") (and/or with any other government agency); testify, assist or participate***

***in any investigation, hearing or proceeding conducted by the EEOC (and/or by any other government agency); or (f) challenge under the OWBPA the knowing and voluntary nature of her release of any claims that she may have under the ADEA***. However, neither the immediately preceding sentence nor any other provision in this Agreement constitute a waiver of any kind by any of the Released Parties of their right to assert the Employee's release of claims as set forth in this Agreement as a defense to any charge or complaint filed with the EEOC, any other government agency, any court, and/or any other tribunal. Excluding the Company, the other Released Parties are ***intended third-party beneficiaries*** of the Releasing Parties' release set forth in this Section 5.

6. No Current Claims/Covenant Not to Sue. The Employee affirms that the Employee has not filed any complaints, claims, or actions against any of the Released Parties with any federal, state or local court or governmental agency, nor any demands for arbitration against any of the Released Parties arising out of, or in connection with, the Employee's employment with the Company (collectively, "Legal Proceedings"). The Employee further agrees not to bring, continue, or maintain any Legal Proceedings against any of the Released Parties based on any claims released under this Agreement. The Employee further agrees that should any Legal Proceedings be filed hereafter on the Employee's behalf against any of the Released Parties with any federal, state, or local agency or by any other person or entity, the Employee will immediately withdraw with prejudice, or cause to be withdrawn with prejudice, or dismiss with prejudice, or cause to be dismissed with prejudice, any such Legal Proceedings as they relate to the Employee. The Employee agrees not to authorize any other person or entity, including any governmental agency, to seek individual remedies for the Employee against any of the Released Parties.

7. Collective/Class Action Waiver. If any claim is not subject to release, to the extent permitted by law, the Employee waives any right or ability to be a class or collective action representative or to otherwise participate in any putative or certified class, collective or multi-party action or proceeding based on such a claim in which any of the Released Parties is a party.

8. Acknowledgments and Affirmations. The Employee affirms that the Employee (a) has been paid and/or has received all compensation, wages, bonuses, and/or commissions which are due and payable as of the date the Employee signs this Agreement, (b) has reported all hours worked as of the date the Employee signs this Agreement, (c) has been granted any leave to which the Employee was entitled under the Family and Medical Leave Act or related state or local leave or disability accommodation laws, (d) has no known workplace injuries or occupational diseases, and (e) has not divulged any proprietary or confidential information and will continue to maintain the confidentiality of such information.

9. Non-Defamation. The Employee shall not defame, disparage, or otherwise make any negative comments or criticism about the Company and its current and past directors, officers, employees, products or services and/or take any action having the effect of damaging the business reputation of the Company, including but not limited to communications on social media websites such as Facebook, Twitter, LinkedIn, or Glassdoor on blogs, by text or email or other electronic means and including in connection with Employee's HR consulting business. This provision does not prohibit Employee from making truthful statements about the terms or conditions of Employee's employment, or from exercising Employee's rights under the National Labor

Relations Act ("NLRB"). The Company's Board of Directors and officers shall not defame, disparage or otherwise make any negative comment or criticism about Employee, including but not limited to communications on social media websites such as Facebook, Twitter, LinkedIn, or Glassdoor on blogs, by text or email or other electronic means.

10. Nondisclosure of Proprietary Information. The Employee acknowledges that the Employee had access to the Company's Proprietary Information as defined below. The Employee promises to hold in the strictest confidence and not disclose to any person, firm, corporation or other entity any of the Company's Proprietary Information, except as required by law. For the purposes of this Agreement, the term "Proprietary Information" shall include information concerning the Company's and any affiliates' management, production design, engineering, finances, strategy, processes, manufacturing, marketing, project management, purchasing, research and development, sales, formulae, all current and future products and product plans, computer software, technology, product and service prices and discounts, identity of materials and product sources, operating costs, ideas, drawings and technical data, financial data and plans, identity of actual, former or potential employees, personnel information, customers, vendors, or suppliers, customer specifications and job requirements, proposals and bidding information, and any other information concerning the business of the Company, its affiliates, customers, vendors, and suppliers in any way which is of a confidential or proprietary nature whether disclosed verbally or in writing.

11. Cooperation. The Employee agrees to cooperate with the Company in any internal investigation, any administrative, regulatory, or legal proceedings or any dispute with a third party. The Employee's cooperation may include being available to the Company upon reasonable notice for interviews and factual investigations, appearing at the Company's request to give testimony without requiring service of a subpoena or other legal process, volunteering to the Company pertinent information, and turning over to the Company all relevant documents which are or may come into the Employee's possession all at times and on schedules that are reasonably consistent with the Employee's other permitted activities and commitments.

12. Non-Cooperation. To the fullest extent permitted by law, the Employee will not cooperate with, or assist, any person or entity in any legal proceedings against the Company. The Employee agrees not to discuss, comment, give, or prepare, any writing involving any issue arising out of, or related to, any legal proceedings in which the Company is, or shall become, involved without first having been so authorized in writing by the Company's General Counsel or by virtue of process issued by a court of competent jurisdiction. Nothing in this Agreement is intended to prevent the Employee from testifying or otherwise participating in a pending legal matter after the Employee has been served with either a subpoena or court order compelling the Employee's participation; provided, however, the Employee agrees to immediately notify the Company and, if requested, to meet with the Company's attorneys before discussing, testifying, commenting, giving, or preparing any writing. This Section 12 does not apply to any legal proceedings in which the Employee is a party.

13. Scope of Release. Nothing in this Agreement shall act as a release of claims based on events occurring after the Effective Date of this Agreement.

14. Confidentiality and Non-Disclosure. The Parties agree that they have kept and will continue to keep the financial terms of this Agreement confidential and agree not to disclose any such information to any person other than (a) by the Employee to the Employee's attorneys, immediate family members, accountants, or tax advisors, each of whom also must keep the information confidential), (b) by the Company on an as needed basis to its officers, directors, management level employees, accountants, or attorneys, or (c) by either Party as may be required in response to a court order, subpoena, or valid inquiry by a government agency. In the event a Court (or jury as the case may be) determines either Party has materially breached this Section 14, the non-breaching Party shall have the right to seek damages that are directly related to the material breach. The Employee also shall not, directly or indirectly, use, publish, disseminate, distribute, or otherwise disclose any information of, or relating to, the Company that is not generally known to the public, including, without limitation, information related to the Company's customers, suppliers, business plans, methods of operations, methods of marketing and sales, business records, customer lists, trade secrets and financial information.

15. Time Period to Accept Agreement and Voluntary Execution. The Employee understands and agrees that the Employee has had up to **twenty-one (21) days** within which to review and consider this Agreement before executing it. In the event that the Employee signs this Agreement before the expiration of the **twenty one (21) day** review period, the Employee expressly affirms that (1) the Employee has carefully read and fully understands all of the provisions of this Agreement; (2) the Employee executed this Agreement voluntarily; (3) the Employee had reasonable time to consider the terms of this Agreement; (4) the Employee knowingly and voluntarily intends to be legally bound by this Agreement; and (5) the Employee was advised and hereby is advised in writing to consider the terms of this Agreement and consult with an attorney of the Employee's choice prior to executing this Agreement.

16. Revocation. The Employee has been advised that the Employee may revoke the Employee's acceptance of this Agreement within seven (7) calendar days following the execution of this Agreement. This Agreement is not effective until the revocation period has expired without revocation ("Effective Date"). The Employee understands that an effective revocation must be in writing, and either (1) postmarked within seven (7) days of execution of this Agreement and addressed to, in a private and confidential envelope, their HR Rep, 5750 Mercury Dr., Dearborn, MI 48126 or (2) emailed to their HR Rep. The Employee understands that if revocation is made by mail, mailing by certified mail, return receipt requested, is recommended to show proof of mailing.

17. Return of Company Property. Within ten days of the Employee's Last Day of Work, the Employee will return to the Company any and all property, tangible or intangible, relating to its business, which the Employee possessed or had control over at any time (including, but not limited to, company-provided credit cards, building or office access cards, keys, computer equipment, manuals, files, documents, records, software, customer information, financial and other data) and that the Employee shall not retain any copies, compilations, extracts, excerpts, summaries or other notes of any such manuals, files, documents, records, software, customer information, financial and other data.

Docusign Envelope ID: D1C605F8-CC52-8E9E-83F0-BD8A78869209

18. Severability. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law. However, if any provision of this Agreement is held to be invalid, illegal, or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality, or unenforceability will not affect any other provision or any other jurisdiction, but this Agreement will be reformed, construed, and enforced in such jurisdiction as if such invalid, illegal, or unenforceable provision had never been contained in this Agreement.

19. Complete Agreement. This Agreement embodies the complete Agreement and understanding among the parties and supersedes and preempts any prior understandings, agreements, or representations by or among the parties, written or oral, which may have related to the subject matter of this Agreement in any way; provided, however, that the Employee's post-employment objections and the Company's rights under Section 6 (Nondisclosure and Protection of Proprietary Information), Section 7 (Assignment of Work Product), Section 8 (Noncompetition and Nonsolicitation), Section 9 (Equitable Relief), and Section 11 (Arbitration) of the Employment Agreement remain in full force and effect after the Effective Date of this Agreement.

20. Counterparts. This Agreement may be executed in separate counterparts, each of which is deemed to be an original and all of which taken together constitute one and the same agreement.

21. Governing Law. All questions concerning the construction, validity and interpretation of this Agreement and the exhibits to this Agreement will be governed by and construed in accordance with the domestic laws of the State of Michigan, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of Michigan or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Michigan.

22. Amendment and Waiver. The provisions of this Agreement may be amended and waived only with the prior written consent of the Company and Employee.

23. No Strict Construction. The language used in this Agreement shall be deemed to be the language chosen by the parties to express their mutual intent and no rule of strict construction shall be applied against either Party.

24. Headings. The section headings in this Agreement are inserted merely for the convenience of reference only and shall not be used to construe, affect, or modify the terms of any provision of this Agreement.

25. Section 409A of the Code. For purposes of this Agreement, each amount to be paid or benefit to be provided will be construed as a separate identified payment for purposes of Section 409A of the Internal Revenue Code of 1986, as amended ("Section 409A"), and any payments that are due within the "short term deferral period" as defined in Section 409A or are paid in a manner covered by Treas. Reg. Section 1.409A 1(b)(9)(iii) will not be treated as deferred compensation unless applicable law requires otherwise. Neither the Company nor the Employee will have the right to accelerate or defer the delivery of any such payments or benefits except to the extent

specifically permitted or required by Section 409A. This Agreement is intended to comply with the provisions of Section 409A, and the Agreement will, to the extent practicable, be construed in accordance therewith. Terms defined in the Agreement will have the meanings given such terms under Section 409A if and to the extent required to comply with Section 409A. In any event, the Company makes no representations or warranty and will have no liability to the Employee if any provisions of or payments under this Agreement are determined to constitute deferred compensation subject to Code Section 409A but not to satisfy the conditions of Section 409A.

26. Acknowledgement. THE EMPLOYEE HAS CAREFULLY READ THIS AGREEMENT AND UNDERSTANDS ITS CONTENTS AND CONSEQUENCES AND THAT THE ONLY PROMISES MADE TO THE EMPLOYEE TO SIGN THIS AGREEMENT ARE THOSE STATED IN THIS AGREEMENT. THE EMPLOYEE IS SIGNING THIS AGREEMENT KNOWINGLY AND VOLUNTARILY, WITHOUT ANY COERCION OR DURESS AND WITH THE FULL INTENT OF RELEASING THE RELEASED PARTIES FROM ANY AND ALL CLAIMS (AND THEIR FUTURE EFFECTS) ARISING FROM THE EMPLOYEE'S RELATIONSHIP WITH THE COMPANY.

______________________________ Dated: ____________________
Signature

[redacted]
Print Name

CARHARTT, INC.

By: ______________________

Its: ______________________

Dated: ____________________